IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CV-543-FL

| | |
|---|---|
| AVX CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | ORDER |
| CORNING INCORPORATED; ) | |
| COMPONENTS, INCORPORATED; ) | |
| CORNING INTERNATIONAL ) | |
| CORPORATION; CORNING SAS; ) | |
| CORNING LIMITED; and CORNING ) | |
| GMBH, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on defendants' motion to stay (DE 117), to which plaintiff has responded in opposition and defendants have replied. In this posture the issues raised are ripe for ruling.[1] For the following reasons, defendants' motion to stay is denied.

**BACKGROUND**

Plaintiff commenced this action on October 15, 2015, asserting claims for cost recovery, damages, and injunctive relief, associated with alleged environmental contamination on its property, located at 3900 Electronics Drive in Raleigh, North Carolina, formerly owned by defendants or affiliated corporate entities (hereinafter "defendants"), between 1962 and 1987. Defendants sold the property to plaintiff in 1987, with contractual agreement to retain liability for existing violations

---

[1] Also pending are defendants' motion to dismiss (DE 113) certain claims in plaintiff's third amended complaint, and plaintiff's motion to dismiss (DE 127) defendants' counterclaims, which motions the court will address by separate order.

of environmental laws, including agreement to "effect all remedial measures required by law or regulation." (Compl. ¶¶ 14, 21). According to the original complaint, the State of North Carolina noticed an illegal "dry well" on the property in 1991, and sampling and environmental assessment reports since then have indicated "the presence of hazardous substances in the soil and groundwater on the Property, but . . . have never fully delineated the vertical or horizontal extent of the impacts." (Id. ¶¶ 22, 26). In its original complaint, plaintiff asserted the following claims:

1) CERCLA cost recovery claim, 42 U.S.C. § 9607(a)(1);

2) Breach of contract;

3) CERCLA declaratory relief claim, 42 U.S.C. § 9613(g)(2);

4) Federal law declaratory relief;

5) Negligence;

6) Negligence per se;

7) Nuisance;

8) Trespass;

9) Injunction;

10) State law declaratory relief.

Plaintiff filed a first amended complaint in June 2016, adding information about certain defendant affiliations, and adding a CERCLA claim for contribution, under 42 U.S.C. § 9613(f)(1). The court entered case management order on June 1, 2016, providing a January 27, 2017, deadline for completion of discovery and a February 28, 2017, deadline for dispositive motions, which deadlines since have been extended and continued upon motion of the parties, as described further herein.

The court held discovery conference on March 8, 2017, at which the court granted motion to withdraw by defendants' counsel, directed consent modification of deadlines, awarded costs and expenses to plaintiff for cancelled depositions, and directed plaintiff to amend complaint to correct certain references to defendants' names and affiliations.

Plaintiff filed a second amended complaint on April 20, 2017, which clarified the status of certain defendants' affiliations, and added several factual allegations about the extent of release of hazardous substances. (See, e.g., 2nd Am. Compl. ¶¶ 26, 27, 28, 43 (alleging hazard substances are present in the "surface water" on the property, in addition to soil and groundwater)).

Defendants filed answer and a corresponding motion to amend answer to the second amended complaint on May 22, 2017, seeking to add six counterclaims for CERCLA recovery and breach of contract, contending that plaintiff is responsible for additional environmental contamination on the property. In addition, defendants filed a motion to dismiss plaintiff's common law claims asserted in second amended complaint and to stay remaining claims.

On June 14, 2017, plaintiff moved to amend the complaint a third time, which motion defendants opposed.[2] Prior to decision on motions then pending, the court received notice of a multi-faceted discovery dispute on October 10, 2017. On October 11, 2017, the court granted defendants' consent motion to extend the discovery deadline from October 20, 2017, to extend through the week of October 23, 2017, to allow for completion of two depositions.

At telephonic conference held October 13, 2017, the court addressed certain remaining disputed discovery issues, as summarized in the clerk's minute entry on the face of the case docket:

---

[2] In the meantime, on August 10, 2017, the case returned from mediation, resulting in impasse.

> At issue is [defendants'] Demand for Inspection of the AVX property and plaintiff's request to strike evidence obtained by [defendants'] in alleged violation of [defendants'] work plan. Court holds discussion regarding the sampling process of [defendants] and disputes arising therefrom. The court determines and counsel consents that the 6 CSIA[3] samples at dispute, obtained by [defendants], will be voided. Counsel is [sic] to consult among each other and submit a revised work plan setting out with specificity of what type of samples will be obtained as well as what type of analysis will be run. Revised work plan shall be filed with the court by Friday 10/20/17. Should counsel desire to file under seal, counsel may do so without motion, if both sides consent.

(Minute entry, Oct. 13, 2017 (DE 104)). As further memorialized in memorandum opinion entered October 17, 2017, the court allowed plaintiff's motion to amend and directed plaintiff to file its third amended complaint and defendants to respond in the time prescribed by the Federal Rules of Civil Procedure. As a result of allowing the motion to amend, the court denied as moot defendants' then-pending motion to dismiss and motion to amend answer (DE 67, 70). The court noted that "the deadline for dispositive motions would be held in abeyance pending further proceedings following filing of amended complaint." (Mem. Op. (DE 106) at 4).

"The court further directed that within 15 days of when the pleadings in this matter finally are settled, either party may file a motion seeking time for limited additional discovery, proposing the time period for such discovery, the issues on which discovery is sought, with indication of the position of the other party, accompanied by proposed order if consented." (Id.).

Plaintiff filed its third amended complaint as directed on October 13, 2017. Therein, plaintiff adds claims for: 1) negligent misrepresentation, 2) unfair and deceptive trade practices, and 3) punitive damages. (Third Am. Compl. (DE 105) claims 12-14). In support of the added claims, plaintiff includes allegations, among others, that defendants "falsified" responses to a program

---

[3] According to materials transmitted to the clerk in advance of informal telephonic conference with the court, the acronym CSIA refers to "Compound Specific Isotope Analysis."

4

eligibility questionnaire submitted to the state to gain entry into a state Registered Environmental Consultant (REC) program in November 2013 (hereinafter the "2013 Questionnaire Response"). (Third Am. Compl. ¶¶ 75-78, 102, 182.D). Plaintiff also includes allegations that defendants "kept secret" from the state and plaintiff a "Data Gap Report" in 2012 that contained recommendations for additional sampling and analysis (hereinafter the "2012 Data Gap Report") (Id. ¶¶ 73-74, 182.F, 189, 190).

On October 20, 2017, the parties filed a consent motion (as corrected on October 23, 2017) for extension of time to January 26, 2018, to conduct additional disputed discovery and to meet and confer regarding the same. On October 25, 2017, the parties filed a consent motion to postpone previously extended deposition deadline. Three times since, by consent, discovery deadlines have been extended, most recently, such that: (1) the parties are allowed to seek the court's assistance regarding outstanding discovery disputes through and including April 30, 2018; and (2) the parties are allowed to take depositions of parties' respective experts (Mark Davidson, David Duncklee, Jay Bennett, Paul Philp Richard Royer and Thomas Hutto) and the two lay witnesses, Dennis Oldland and Larry Blue by May 31, 2018.

In the meantime, the parties briefed the instant motion to stay filed October 27, 2017, as well as the pending motions to dismiss, submitted to the court on March 5, 2018, as corrected March 26, 2018. In the instant motion, defendants seek to stay the case in its entirety through October 2018, based upon the doctrine of primary jurisdiction and the court's inherent powers to stay proceedings. Defendants seek such stay to allow for their anticipated completion of a remedial investigation plan (hereinafter, the "remedial investigation plan"), commenced pursuant to a October 2015 agreement

with the North Carolina Department of Environmental Quality ("NCDEQ") (hereinafter, the "2015 NCDEQ Agreement").

Under the terms of the 2015 NCDEQ Agreement, defendant Corning Incorporated agreed to submit to NCDEQ the remedial remedial investigation plan, certified by its environmental consultant AMEC Foster Wheeler ("AMEC"), within three years, or by October 2018. (2015 NCDEQ Agreement (DE 118-12) at 4, Sec. III.B.).[4] Within two years thereafter, or by October 2020, defendant Corning Incorporated agreed to "initiate groundwater remedial action" in compliance with state environmental regulations. (Id. Sec. III.C.). Within eight years of execution of the agreement, or by October 2023, defendant Corning Incorporated agreed to complete remaining remedial actions.

In support of the motion to stay, defendants rely upon the following exhibits, in addition to the 2015 NCDEQ Agreement: 1) purchase and sale agreements executed in 1987 between the parties, as referenced in the complaint; 2) a 2016 remedial investigation work plan; 3) expert reports disclosed by defendants and email correspondence regarding the same; 4) declarations of Blake Manuel and Christy Hannan, engineers previously employed by Corning Incorporated, as well as a declaration of James A. Bennett ("Bennett"), a project manager employed by AMEC, with exhibits including the 2015 NCDEQ Agreement and the 2012 Data Gap Report.

On December 1, 2017, defendants filed a notice of subsequent facts, attaching a November 9, 2017, "Compliance Order with Administrative Penalties for Violations of REC Program Rules" to AMEC (hereinafter the "AMEC Compliance Order"). (DE 121-1).

---

[4] For citations to documents identified by docket entry (DE) numbers, page numbers provided are those corresponding to the page numbers specified in the court's electronic case filing (ECF) system and not the page number provided, if any, on the face of the document.

In opposition to the instant motion, plaintiff relies upon twenty-four exhibits, including 1) the AMEC Compliance Order and documentary exhibits already submitted by defendants; 2) a November 9, 2017, "Disqualification Order" sent by NCDEQ to Dan Shields ("Shields"), a former "Registered Site Manager" under the 2015 NCDEQ Agreement (hereinafter, the "Shields Disqualification Order"); 3) excerpts of depositions of Shields, Manuel Hannan, NCDEQ officials, and others involved in potential purchase of the property; and 4) additional property reports and correspondence.

In their reply, defendants rely upon fourteen exhibits, including 1) correspondence and reports regarding past audits and investigations of the property; 2) excerpts of deposition testimony; 3) report of findings of post-demolition sub-slab soil sampling at the property in 2016, and correspondence related thereto; 4) environmental evaluations of the property prepared for the Wake County Board of Education and Marlow Land and Farm Inc., in 2015; 5) a summary of discovery responses and depositions; 6) defendants' demand for inspection of the property and correspondence related thereto; and 7) 2017 correspondence regarding status updates related to the remedial investigation plan.

**COURT'S DISCUSSION**

A. Legal Standards

    1. Primary Jurisdiction

The doctrine of primary jurisdiction is "specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." Reiter v. Cooper, 507 U.S. 258, 268 (1993). "It requires the court to enable a referral to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling."

Id. (internal quotations omitted). "No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." United States v. Western Pac. R.R. Co., 352 U.S. 59, 64 (1956). "Generally speaking, the doctrine is designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion." Envtl. Tech. Council v. Sierra Club, 98 F.3d 774, 789 (4th Cir. 1996). "Despite what the term primary jurisdiction may imply, it does not speak to the jurisdictional power of the federal courts. It simply structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts." Id. at 789 n.24 (quotation omitted).

"The grant or denial of a request to stay proceedings calls for an exercise of the district court's judgment 'to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket.'" Maryland v. Universal Elections, Inc., 729 F.3d 370, 375 (4th Cir. 2013) (quoting United States v. Ga. Pac. Corp., 562 F.2d 294, 296 (4th Cir.1977)). Although the Fourth Circuit has not articulated specific factors, courts within this circuit have identified four factors that may be considered, albeit not exclusively, in deciding whether to grant a stay due to the doctrine of primary jurisdiction:

> (1) whether the question at issue is within the conventional experience of judges or is within the agency's particular filed [sic] of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

Longo v. Trojan Horse Ltd., 992 F. Supp. 2d 612, 617 (E.D.N.C. 2014) (citing Nat'l Comm. Ass'n, Inc. v. American Tel. & Tel. Co., 46 F.3d 220, 222 (2d Cir.1995)); see Duke Energy Progress, Inc. v. Frontier Commc'ns of the Carolinas, Inc., No. 5:13-CV-617-FL, 2014 WL 4948112, at *3 (E.D.N.C. Sept. 25, 2014) (same); Cent. Tel. Co. of Virginia v. Sprint Commc'ns Co. of Virginia, 759 F. Supp. 2d 772, 786 (E.D. Va. 2011) (same).

    2.    Inherent Power to Stay

"District courts . . . ordinarily have authority to issue stays, where such a stay would be a proper exercise of discretion." Rhines v. Weber, 544 U.S. 269, 276 (2005). "[A] district court may stay a case pending before it by virtue of its inherent power to control the progress of the cause so as to maintain the orderly processes of justice." Ryan v. Gonzales, 568 U.S. 57, 74 (2013) (quotations omitted). "[C]ourts have inherent power to stay proceedings and 'to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" Stone v. I.N.S., 514 U.S. 386, 411 (1995) (quoting Landis v. North American Co., 299 U.S. 248, 254 (1936)). A decision to stay proceedings, however, "must weigh competing interests and maintain an even balance." Landis, 299 U.S. at 254-55. The party moving "for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." Id. at 255.

B.    Analysis

    1.    Primary Jurisdiction

A stay due to the doctrine of primary jurisdiction is not warranted at this juncture for several reasons. First, there is not before this court presently an issue for decision "within the special competence of an administrative agency." Reiter, 507 U.S. at 268. At this stage in the case, there

9

are not "issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion." Envtl. Tech. Council, 98 F.3d at 789. Rather, the pleadings have not been framed in the case, and the parties have requested a judicial determination, through partial motions to dismiss, as to whether certain claims asserted in the third amended complaint and counterclaims thereto should be dismissed as a matter of law. Included therein are several common law claims, (see, e.g., 3rd Am. Compl. ¶¶ 127-133, 140-168, 181-205), and the determination as to whether such claims should proceed is not suitable for resolution by the exercise of administrative discretion. Reiter, 507 U.S. at 268; Envtl. Tech. Council, 98 F.3d at 789.

Second, there does not "exist[] a substantial danger of inconsistent rulings," Longo, 992 F. Supp. 2d at 617, nor even a "reasonable opportunity to seek an administrative ruling," Reiter, 507 U.S. at 268, because there is not any enforcement proceeding ongoing from which an administrative "ruling" is expected. The REC program in which defendants are involved with their consultant, AMEC, is a "voluntary remedial action program," and if defendant Corning Incorporated "elects to discontinue implementation of work under" the 2015 NCDEQ Agreement, no administrative ruling results therefrom. (2015 NCDEQ Agreement (DE 118-12) at 3, 6). While the NCDEQ at that point "shall retain all its applicable enforcement rights against" defendant Corning Incorporated under the terms of the 2015 NCDEQ Agreement, such dissolution does not automatically put into play any administrative enforcement action or necessarily subject defendants to an administrative ruling. (Id. at 7).

Third, and relatedly, defendants have not demonstrated that there is any administrative agency that is or will be capable of taking a "referral to the agency" from this court, Reiter, 507 U.S. at 268, for consideration of "issues of fact not within the conventional experience of judges or cases

10

which require the exercise of administrative discretion." Envtl. Tech. Council, 98 F.3d at 789. Indeed, as noted by the current Registered Site Manager for the 2015 NCDEQ Agreement employed by AMEC:

> Due to the large number of contaminated sites in the state, [NCDEQ] is not able to respond to all requests for remedial action oversight. To help address this problem, the North Carolina General Assembly amended the Inactive Hazardous Response Act in 1994 and 1995 to establish the REC Program, which provides a mechanism for privatizing [NCDEQ's] oversight role at certain voluntary remedial action sites.

(Bennet Decl. (DE 118-11) ¶3) (emphasis). NCDEQ "conducts any necessary enforcement at sites deemed to be the highest priority, and conducts work itself at orphaned sites when state resources are available for such." (Id. ¶ 2). In sum, due to limited funding and administrative priorities, NCDEQ administrative enforcement or administrative remedial action involving the property is not taking place and is not likely to take place. Accordingly, there is no basis reasonably for a "referral to the agency" under the doctrine of primary jurisdiction. Reiter, 507 U.S. at 268.

Finally, the November 2017 AMEC Compliance Order and Shields Disqualification Order raise substantial questions concerning whether defendant Corning Incorporated will be able to complete successfully the terms of the 2015 NCDEQ Agreement, and whether and to what extent in this action the court must defer to determinations made as a result of the 2015 NCDEQ Agreement. In its November 2017 orders, NCDEQ "permanently disqualified [Shields] from performing any work as an RSM in North Carolina," and imposed a $6,500.00 penalty upon AMEC, based upon findings that Shields "fail[ed] to be truthful and objective in all submitted professional reports" and by making "false statement(s), representations or certifications," in the 2013 Questionnaire Response submitted to NCDEQ in preparation for entry into the 2015 NCDEQ

11

Agreement. (Shields Disqualification Order (DE 124-2) at 5; AMEC Compliance Order (DE 124-4)).

Defendants suggest, nonetheless, that these orders by NCDEQ, along with other communications between NCDEQ and AMEC, demonstrate NCDEQ's "active engagement in the remedial work taking place under the" 2015 NCDEQ Agreement, such that the court should defer to such ongoing administrative action. (Notice of Subsequent Authority (DE 121) at 3). The recent administrative activity, however, cuts both ways. On the one hand, NCDEQ's current active engagement may positively impact the reliability of the information developed going forward. On the other hand, the reason for the active engagement, particularly where sparked by the misconduct identified in the NCDEQ orders, may tend to highlight the need for further adversarial testing of any evidence generated pursuant to the 2015 NCDEQ Agreement. In any event, whatever its ultimate probative value on the issues in this action, the recent NCDEQ activity does not transform the voluntary 2015 NCDEQ Agreement into an administrative remediation or enforcement action warranting a stay under the doctrine of primary jurisdiction.

Defendants also argue that there is a risk of "inconsistent rulings" because a court injunction could conflict with the plan for remedial work to be developed under the 2015 NCDEQ Agreement. (Reply (DE 129) at 5). They contend that "judicial economy" favors awaiting certification of the remedial investigation report, because findings therein "delineating the contamination" could streamline issues in this action. (Defs' Mem. (DE 118) at 15-16; Reply (DE 129) at 6). These arguments miss the mark, however, because the issue of the propriety and scope of injunctive relief is not presently before the court. The court has yet to determine which claims can proceed forward as a matter of law, much less which claims have merit and could support the injunctive relief requested by plaintiff. At the same time, defendants have not demonstrated that remediation

requirements yet to be developed under the 2015 NCDEQ Agreement, a voluntary agreement involving only one party to this action, will be sufficient to resolve all issues of contested responsibility and contribution between the parties to this action. Any assessment of risk of inconsistent rulings at this juncture is premature and speculative.

In any event, if there are efficiencies that may accrue by awaiting outcome of the remedial investigation report or providing a schedule for discovery of the same, then that is an issue that may be raised with the court upon consideration of a case schedule for discovery and dispositive motions after the pleadings are framed. The potential for such efficiencies does not justify an immediate stay of all proceedings under the doctrine of primary jurisdiction.

In sum, considering the present circumstances of this case, defendants' motion for a stay of all proceedings due to the doctrine of primary jurisdiction is denied.

2. Inherent Power to Stay

The court in its discretion declines to exercise its inherent power to stay this action, in light of all the foregoing circumstances informing upon the doctrine of primary jurisdiction. In addition, at this juncture in the case, defendants have not made out "a clear case of hardship or inequity in being required to go forward," where there is a reasonable possibility that the stay requested will prejudice plaintiff's ability to fairly present its case. Landis, 299 U.S. at 255. However, such determination is without prejudice to reconsideration of the issues raised by defendants in conjunction with determining a plan and schedule for remaining discovery and dispositive motions, after the pleadings have been framed.

## CONCLUSION

Based on the foregoing, defendants' motion to stay (DE 117) is DENIED. The court will address by separate order motions to dismiss that are remaining for decision (DE 113, 127).

SO ORDERED, this the 25th day of April, 2018.

_____
LOUISE W. FLANAGAN
United States District Judge