IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CV-543-FL

AVX CORPORATION,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )
                                    )                    ORDER
CORNING INCORPORATED;               )
COMPONENTS, INCORPORATED;           )
CORNING INTERNATIONAL               )
CORPORATION; CORNING SAS;           )
CORNING LIMITED; and CORNING        )
GMBH,                               )
                                    )
                Defendants.         )

This matter is before the court on defendants' motion to dismiss plaintiff's state law claims

(DE 113), and plaintiff's motion to dismiss and or strike counterclaims (DE 127).   The motions

have been briefed fully.  In this posture the issues raised are ripe for ruling. For the following

reasons, defendants' motion to dismiss is granted in part and denied in part, and plaintiff's motion

is denied.

## BACKGROUND

Plaintiff commenced this action on October 15, 2015,[1] asserting claims for cost recovery,

damages, and injunctive relief, associated with alleged environmental contamination on its property,

located at 3900 Electronics Drive in Raleigh, North Carolina, (hereinafter, the "Property") formerly

---

[1] As discussed herein, the operative or currently controlling complaint was not lodged on the docket until
October 13, 2017, in the form of plaintiff's third amended complaint.

owned by defendants or affiliated corporate entities (hereinafter "defendants"),[2] between 1962 and 1987. Defendants sold the Property to plaintiff in 1987, with contractual agreement to retain liability for existing violations of environmental laws, including agreement to "effect all remedial measures required by law or regulation." (Compl. ¶ 25).[3] In its original complaint, plaintiff asserted the following claims:

1) Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") cost recovery claim, 42 U.S.C. § 9607(a)(1);

2) Breach of contract;

3) CERCLA declaratory relief claim, 42 U.S.C. § 9613(g)(2);

4) Federal law declaratory relief;

5) Negligence;

6) Negligence per se;

7) Nuisance;

8) Trespass;

9) Injunction;

10) State law declaratory relief.

---

[2] Defendant Corning Incorporated (formerly known as Corning Glass Works) ("Corning, Inc.") is a New York corporation with a principal place of business in New York. The other defendants are each subsidiaries of Corning, Inc.: Defendant Components, Incorporated is a Delaware corporation with a principal place of business in New York; defendant Corning International Corporation is a Delaware Corporation with principal place of business in New York; Defendant Corning SAS (successor in interest to Corning France, S.A.) is a French corporation with a principal place of business in France; Defendant Corning Limited is a United Kingdom Corporation with a principal place of business in England; Defendant Corning GmbH is a German corporation with principal place of business in Germany. Defendants each are alleged to have been involved in the ownership, operation, and sale of the Property, as set forth in more detail herein. (See Compl. at p. 1 and ¶¶ 2-7).

[3] Unless otherwise specified, all references to the "complaint" in the text or "Compl." in citations shall refer to the Third Amended Complaint filed October 13, 2017.

Defendants answered the original complaint, on January 29, 2016, asserting no counterclaims and twenty affirmative defenses, including sixth and sixteenth affirmative defenses asserting that plaintiff's "own operations may have contributed to" the contamination present at the Property. (Answer (DE 12) at 14, 16).

The court entered case management order on June 1, 2016, providing a January 27, 2017, deadline for completion of discovery and a February 28, 2017, deadline for dispositive motions, which deadlines since have been extended and continued upon motion of the parties, as described further herein. The case management order also provided a deadline of June 10, 2016, to amend the pleadings.

Plaintiff moved to amend complaint on June 10, 2016, and upon court order allowing the same filed first amended complaint June 14, 2016, adding information about certain defendant affiliations, and adding a CERCLA claim for contribution, under 42 U.S.C. § 9613(f)(1). Defendants again answered with no counterclaims and twenty affirmative defenses.

The court entered an amended case management order on October 25, 2016, extending the deadline for discovery to April 27, 2017, and deadline for dispositive motions to May 29, 2017. The deadline for amending the pleadings remained June 10, 2016, then passed.

The court held telephonic discovery conference on March 8, 2017, at which the court granted motion to withdraw by defendants' counsel, directed consent modification of deadlines, awarded costs and expenses to plaintiff for cancelled depositions, and directed plaintiff to amend complaint to correct certain references to defendants' names and affiliations. Consent second amended case management order entered March 24, 2017, extended the deadline for discovery to September 15, 2017, and dispositive motions to October 16, 2017. The court therein directed plaintiff to "amend

the complaint to conform to the current corporate structures of each defendant by April 20, 2017."
(Order (DE 57) at 5).

Plaintiff filed a second amended complaint on April 20, 2017, which clarified the status of defendants' affiliations, and added several factual allegations about the extent of release of hazardous substances. (See, e.g., 2nd Am. Compl. ¶¶ 26, 27, 28, 43 (alleging hazard substances are present in the "surface water" on the Property, in addition to soil and groundwater)).

Defendants filed answer and a corresponding motion to amend answer to the second amended complaint on May 22, 2017, seeking to add six counterclaims for CERCLA recovery and breach of contract, contending that plaintiff is responsible for additional environmental contamination on the Property. In addition, defendants filed a motion to dismiss plaintiff's state law claims asserted in second amended complaint and to stay remaining claims. Plaintiff opposed both motions substantially on the same grounds asserted in opposition to the instant motions.

On June 14, 2017, plaintiff moved to amend the complaint a third time, which motion defendants opposed.[4] Prior to decision on motions then pending, the court received notice of a multi-faceted discovery dispute on October 10, 2017. On October 11, 2017, the court granted defendants' consent motion to extend the discovery deadline from October 20, 2017, to extend through the week of October 23, 2017, to allow for completion of two depositions.

At telephonic conference held October 13, 2017, the court addressed certain remaining disputed discovery issues, as summarized in the clerk's minute entry on the face of the case docket:

> At issue is [defendants'] Demand for Inspection of the [Property] and plaintiff's request to strike evidence obtained by [defendants'] in alleged violation of [defendants'] work plan. Court holds discussion regarding the sampling process of

---

[4] In the meantime, on August 10, 2017, the case returned from mediation, resulting in impasse.

[defendants] and disputes arising therefrom. The court determines and counsel consents that the 6 CSIA[5] samples at dispute, obtained by [defendants], will be voided. Counsel is [sic] to consult among each other and submit a revised work plan setting out with specificity of what type of samples will be obtained as well as what type of analysis will be run. Revised work plan shall be filed with the court by Friday 10/20/17. Should counsel desire to file under seal, counsel may do so without motion, if both sides consent.

(Minute entry, Oct. 13, 2017 (DE 104)). As further memorialized in memorandum opinion entered October 17, 2017, the court allowed plaintiff's motion to amend, upon showing of good cause to modify the case management order, and the court directed plaintiff to file its third amended complaint and directed "defendants to respond in the time prescribed by the Federal Rules of Civil Procedure." (Mem. Op. (DE 106) at 4). As a result of allowing the motion to amend, the court denied as moot defendants' then-pending motion to dismiss and motion to amend answer (DE 67, 70). The court noted that "the deadline for dispositive motions would be held in abeyance pending further proceedings following filing of amended complaint." (Mem. Op. (DE 106) at 4).

"The court further directed that within 15 days of when the pleadings in this matter finally are settled, either party may file a motion seeking time for limited additional discovery, proposing the time period for such discovery, the issues on which discovery is sought, with indication of the position of the other party, accompanied by proposed order if consented." (Id.).

Plaintiff filed its third amended complaint as directed on October 13, 2017. Therein, plaintiff added claims for: 1) negligent misrepresentation, 2) unfair and deceptive trade practices, and 3) punitive damages, with additional factual allegations. Defendants filed answer and six counterclaims, on October 27, 2017, for CERCLA recovery, breach of contract, and declaratory

---

[5] According to materials transmitted to the clerk in advance of informal telephonic conference with the court, the acronym CSIA refers to "Compound Specific Isotope Analysis."

relief, contending that plaintiff is responsible for additional environmental contamination on the Property.

On the same date, defendants also filed the instant motion to dismiss seeking dismissal of plaintiff's state law tort claims on the basis of North Carolina economic loss rule and breach of contract claim for failure to state a claim. In support of their motion to dismiss, defendants rely upon an affidavit of counsel in this matter attaching copies of documents referenced in the complaint. Included with its opposition to the instant motion to dismiss, plaintiff attaches to orders issued by the North Carolina Department of Environmental Quality concerning defendants' environmental consultant, issued November 9, 2017.

Plaintiff filed the instant motion to dismiss and/or strike counterclaims on January 12, 2018. In opposition to the motion, defendants rely upon a declaration of counsel attaching findings and reports of environmental assessments of the Property referenced in their opposition; deposition excerpts; and correspondence of counsel. In reply, plaintiff relies upon party and internal emails; excerpts and summaries of investigation reports; deposition excerpts; and excerpts of other documents referenced in the reply.

In the meantime, on October 20, 2017, the parties filed a consent motion (as corrected on October 23, 2017) for extension of time to January 26, 2018, to conduct additional disputed discovery and to meet and confer regarding the same. By consent, discovery deadlines have been extended, and most recently, on July 16, 2018, the court allowed the parties an extension of time to September 30, 2018, to complete specified depositions and to conclude discovery negotiations, including depositions of parties' respective experts (Mark Davidson, David Duncklee, Jay Bennett,

Paul Philp Richard Royer and Thomas Hutto) and two lay witnesses, Dennis Oldland and Larry Blue.[6]

Also in the meantime, defendants filed a motion to stay the case through October 2018, to allow for their anticipated completion of a remedial investigation plan (hereinafter, the "remedial investigation plan"), commenced pursuant to a October 2015 agreement with the North Carolina Department of Environmental Quality ("NCDEQ") (hereinafter, the "2015 NCDEQ Agreement").

On April 25, 2018, the court denied the motion to stay, noting pendency of the instant motions to dismiss and the need for framing of the pleadings. The court noted: "[I]f there are efficiencies that may accrue by awaiting outcome of the remedial investigation report or providing a schedule for discovery of the same, then that is an issue that may be raised with the court upon consideration of a case schedule for discovery and dispositive motions after the pleadings are framed."

## STATEMENT OF FACTS

A.     Complaint

The facts alleged in the complaint may be summarized as follows. Defendants built and operated a manufacturing facility at the Property from 1962 to November 1987, when plaintiff purchased the Property from defendants. The terms of the purchase were governed by a contract for purchase and sale (hereinafter, the "Purchase Agreement"), amendment thereto (the "Amendment"), and a letter agreement regarding the same (the "Letter Agreement"). (Compl. ¶¶ 5, 7, 9, 17).

Under the Purchase Agreement, defendants retained "all liabilities for violations of environmental laws and health and safety laws applicable to such operation, which violations

_____

[6] On August 14, 2018, the parties noticed need for telephonic discovery conference in advance of motion to compel and for sanctions, with telephonic conference scheduled before magistrate judge.

existed, or are based upon conditions that existed, prior to the Closing Date" (hereinafter "Retained Liabilities"). (Id. ¶ 18). Defendants also retained "all other liabilities and obligations of or with respect to the Corning Electronics Business and the Corning Assets other than the AVX Assumed Liabilities." (Id. ¶ 19). "Environmental liability is not an AVX Assumed Liability under the Purchase Agreement." (Id.).

Defendants also agreed to indemnify and hold plaintiff, its directors, officers, employees and affiliates harmless from and against "any and all claims, liabilities, losses, damages, costs and expenses, including reasonable counsel fees" arising out of or relating to any Retained Liabilities. (Id. ¶ 20). In the Letter Agreement, defendants "acknowledged that [plaintiff's] consultants indicated the possibility that certain sites located on the Property may be contaminated by hazardous substances." (Id. ¶ 21).

Hazardous substance contamination identified by plaintiff during due diligence prior to the closing date included contamination in the vicinity of a "chemical storage shed" that included a drain in its floor that emptied "directly into the soil and groundwater." (Id. ¶ 22). In November 1987, the State of North Carolina (the "State") completed a pollution incident report that described the contamination as follows:

> An injection well (concrete sump) tied to floor drains in virgin solvent storage shed was discovered during an environmental audit; preliminary soil sample analysis indicates high concentrations of chlorinated hydrocarbons.

(Id. ¶ 27). Starting in 1987 and continuing to present, this injection well (hereinafter, the "Injection Well") has been subject of reports and findings by defendants and the State, as well as plaintiff's claims in this lawsuit.

Those reports and findings indicate the presence of defendants' harmful chemicals in the soil, surface water and groundwater on the Property, but the reports and findings by defendants never fully defined the vertical or horizontal extent of the impacts, as requested by the State. (See id. ¶¶ 34, 38, 40, 43, 46-48, 52-53, 55, 66, 73, 85). In 1992, defendants' environmental consultant "installed a pump and treat groundwater [r]emediation [s]ystem at the Property" (the "Remediation System"). (Id. ¶ 65). Plaintiff leased an 11-acre portion of the Property to defendants to allow defendants "to operate and maintain" the Remediation System. (Id. ¶ 68). Defendants operated the system from 1992 to July 1996, March 1997 to November 2008, and then "in a very limited extent" starting in March 2013. (Id. ¶¶ 70-72).

In 2012, defendants commissioned an internal report by their consultant that contained the following conclusions about the need for further assessment of contamination (hereinafter, the "Data Gap Report"):

[1]     Based on the data obtained, additional assessment is required to delineate the vertical and lateral extent of the [subject contaminants] in the [specified groundwater] zones, as well as to determine the horizontal limit of impact in the shallow saprolite aquifer. In addition, it needs to be determined if the [subject contaminants] have migrated off the property and if the concentrations of [subject contaminants] present a vapor intrusion threat to the residential properties to the east. Concentrations of the [subject contaminants] in the surface water have historically exceeded 2B Surface Water Standards. Additional surface water testing is necessary off-site to determine concentrations in the surface water in the residential areas.

[2]     The soil data collected as part of the secret data gap evaluation demonstrated the concentrations of [subject contaminants] remain in the former excavation area.

[3]     A vertical downward groundwater flow gradient was measured in deep saprolite to [specified groundwater] wells and deeper into bedrock. This indicates that contamination is being transported deeper. The vertical extent of the [subject contaminants] impact has not been defined. Horizontal groundwater movement in shallow and deep saprolite zones indicate

9

groundwater to surface water pathways are present and that off-site groundwater impact is highly possible with vapor intrusion issues yet to be evaluated that could impact off-site residents.

[4]     The remediation strategy and cost evaluation was based on the incomplete vertical and horizontal definition of the groundwater plume.

[5]     The groundwater site pump and treat system should be operated in a limited capacity to further detain plume movement off site until a permanent treatment solution is implemented, or until it is known that no off-site impacts to human health are present (i.e., via surface water exposure, vapor intrusion, etc.).

[6]     The site should be moved into the [State Registered Environmental Consultant ("REC"] program to complete [remedial investigation] activities and begin remedial activities. The [remedial investigation] activities should be completed to confirm there is no threat to nearby residences either due to the intrusion of vapors, or exposure to impacted surface water. Prior to implementation of any remediation strategy, the extent of impact must be defined in groundwater. The remediation strategy and pathway can be adjusted so that additional technologies can be considered as needed.

(Id. ¶¶ 73-74).  At defendants' request, in November 2013, defendants' consultant submitted a "Site Cleanup Questionnaire Response" (hereinafter "REC Program Questionnaire Response") to the State that contained the following responses to seven questions posed:

[1] "Are site surface soils known to be contaminated? - NO"

[2] "Is site sediment or surface water known to be contaminated? - NO"

[3] "Are hazardous vapors, air emissions or contaminated dust migrating into occupied residential, commercial or industrial areas? If yes, or unknown, please explain on separate page. – NO"

[4] "Have hazardous substances known to have migrated off property at concentrations in excess of Branch unrestricted-use remediation goals? If yes, or unknown, please explain on a separate page. – NO"

[5] "Has the local community expressed concerns about contamination at the site? – NO"

[6] "Based on current information, are there any sensitive environments located on the property? If yes, or unknown, please explain on a separate page. – NO"

[6] "Based on current information, has contamination from the site migrated into any sensitive environments? If yes, or unknown, please explain on a separate page. – NO"

(Id. ¶ 76).  The responses given were materially false and misleading in light of the information contained in the Data Gap Report and other information known to defendants at the time they were made.  (See Compl. ¶ 78).  The State relied upon the REC Program Questionnaire Response in determining REC Program eligibility and notified defendants of eligibility for the REC Program in March 2014.  Under a voluntary REC Program agreement with the State, commenced in October 2015, defendants agreed "to proceed with investigative and cleanup activity with no State oversight" over the course of eight years, addressing only the 11 acre leased area of the Property.  (Id. ¶ 83).  Defendants have "refused to assess or remediate any part of the Non-Leased Area of the Property and [have] no agreement with the State to assess or remediate the Non-Leased Area," even though "sampling has indicated environmental impacts in the Non-Leased Area of the Property" for which defendants are responsible.  (Id.).

Plaintiff has been unable to sell the Property because a prospective purchaser will not close on a sale "due to [defendants'] failure to assess and remediate adequately environmental conditions at, on and from the Property at this time."  (Id. ¶ 81).

B.     Counterclaims

The facts alleged in defendants' counterclaims may be summarized as follows.  In March 2016, samples of water from a floor drain located in the boiler/chiller room in the basement of the manufacturing plant (the "Plant") on the Property indicated that trichloroethylene (TCE) was present in the floor drain, and TCE was detected in soil near a hole in the floor.  Plaintiff demolished the

Plant, including the concrete slab that formed the foundation of the building, in 2016. Demolition of all the structures above the concrete floor slabs was completed on July 21, 2016. The concrete slabs that formed the foundation of the building were removed from October 17 through November 9, 2016.

"[B]ecause the structures above the floor slab were demolished almost three months before demolition began on the concrete slab, rainwater . . . accumulate[d] on the slab, and was able to leach through cracks and holes" in the slab. (Counterclaims ¶ 27). This "caused residual contamination in the Plant to leach to the ground and made the contamination in the groundwater on the Property worse." (Id.).

Before removing the concrete slabs, plaintiff asserted that any potential contamination to groundwater caused by removing the slabs "should have little effect on changing the site's overall groundwater quality" because [defendants'] existing pump-and-treat system would "maintain groundwater capture." (Counterclaims ¶ 32). In a pre-demolition inspection of the slab, plaintiff's consultant failed to account for more than half of the drains previously identified by defendants' consultants, ten out of 14 sumps previously identified, and observed cracks in the slab.

After the slabs were removed, plaintiff's consultant performed soil sampling in the footprint of the former Plant. TCE was identified in 21 different locations under the slab. Seven of these locations showed TCE impacts above soil to groundwater leachability levels, with concentrations seven times the North Carolina standard for soil to groundwater leachability levels. "The highest concentrations of TCE were found in the area of the former boiler/chiller room." (Id. ¶ 37). "Groundwater sampling in recent months has shown that groundwater in these areas is impacted by

TCE at levels thousands of times higher than the applicable North Carolina groundwater standard." (Id. ¶ 38).

"Most of the groundwater monitoring wells within the area of [defendants'] preexisting pump-and-treat system have shown downward trends in TCE levels for many years since the removal of the [Injection Well] and affected soil in the later 1980s." (Id. ¶ 39). "Several wells located hydraulically downgradient of the former Plant are now exhibiting an increasing TCE trend, which has sharpened following [plaintiff's] demolition of the Plant and slabs, confirming a separate, more recent source of TCE in the former building area, and that removal of the slabs has exacerbated groundwater contamination, including in the area of Corning's pre-existing pump-and- treat system." (Id.).

Plaintiff's "operations at the Plant utilized volatile organic compounds, including TCE, that have been found in monitoring wells installed by [defendants'] environmental consultants as part of [defendants'] remedial efforts." (Id. ¶ 40). Plaintiff has asserted "that it did not use TCE at the Plant after it purchased the Plant from [defendants] in 1987." (Id. ¶ 41). "However, [according to the counterclaims], this assertion is contradicted by several pieces of evidence, including, for example":

a.    Although [plaintiff's] files were incomplete, material safety data sheets for both "virgin" TCE and several products containing TCE were nonetheless found in [plaintiff's] files at the Plant after this case was instituted (and before [plaintiff] demolished the Plant). Several of these data sheets post-dated [defendants'] operations at the Plant.

b     Inventory sheets prepared by [plaintiff's] employees were found in [plaintiff's] files. Although these records were incomplete, they nonetheless indicated that products containing TCE were kept on hand at the Plant.

c.    [T]esting at the Plant in 2016 — nearly 30 years after [defendants'] sold the Plant to [plaintiff] —found TCE in water from an interior floor drain and in a soil sample from an area where a relatively recent spill was apparent.

d.    Soil gas sampling south of the boiler room—where current data shows there is significant TCE contamination—showed no measurable concentrations of TCE in 1987. These tests would have shown TCE if it had been present at that time, as evidenced by the fact that identical tests in the vicinity of the dry well (where all parties agree TCE contamination was present in 1987) showed TCE contamination.

e.    [Plaintiff] has relied, in asserting that it never used TCE at the Plant, on the testimony of Martha Girolami—a former [plaintiff's] employee—that [plaintiff] banned the use of TCE and trichloroethane (TCA) during her entire tenure with [plaintiff], which began in 1987. However, [plaintiff] has admitted in a 1996 Consent Order with the state of South Carolina that it used TCE and TCA at [a] Myrtle Beach property it owned until 1993. . . .

(Id.).   "NCDEQ issued [plaintiff] several written notices of violation of hazardous waste management laws during [plaintiff's] operation of its Plant. An October 23, 2003 NCDEQ inspection report for the . . . Plant noted that hazardous waste was visible on the walls and floors surrounding hazardous waste storage receptacles in numerous areas within the Plant, and stated that [plaintiff's] personnel argued that no notice of violation should be issued because 'previous inspectors have not enforced this regulation.'"  (Id. ¶ 42).

"A June 2015 Phase I Environmental Site Assessment of the Property by Proctor Environmental Services reviewed groundwater monitoring results and concluded that 'it's possible there's another source or sources of impacted groundwater in the vicinity of the loading dock or from the northwest building corner.' Both the loading dock of the Plant and the northwest corner of the Plant are upgradient of the location of the former dry well."  (Id. ¶ 43).

"In 2015, Mid-Atlantic Associates, Inc., investigated the Plant building for the Wake County Board of Education in connection with a proposed purchase. It found substantial contamination. In

a September 3, 2015 Environmental Evaluation, Mid-Atlantic reported TCE contamination in sub-slab vapor sampling that, in one area of the Plant building, exceeded the North Carolina residential screening level by more than 63,000 times. Mid-Atlantic also reviewed available information, including AVX's hazardous waste generation records, and concluded that a groundwater contaminant source 'may be emanating from the southwest portion of the manufacturing building.' The southwest portion of the manufacturing building is upgradient of the location of the former dry well." (Id. ¶ 44).

"Recent groundwater samples from monitoring wells upgradient of the dry well have indicated elevated levels of volatile organic compounds beneath the footprint of the former Plant. For example, recent sampling of MW-30B, a groundwater well located in the area of the boiler/chiller room, found TCE in groundwater at a level . . . thousands of times higher than the applicable groundwater standard." (Id. ¶ 46).

"Recent groundwater testing from monitoring wells installed in the former . . . [P]lant area show levels of TCE contamination greater than those in the dry well plume to the south." (Id. ¶ 47). "This source or sources of groundwater, surface water, and/or soil contamination are the result of [plaintiff's] operations at the Property as the contamination was not present at the time the Property was sold to [plaintiff]." (Id. ¶ 48). Defendants' "remedial and investigation efforts at the Property have been remediating contamination caused by [plaintiff's] operations, and [defendants'] future assessment and remediation efforts pursuant to the [2015] NCDEQ Agreement will further identify and remediate contamination caused by [plaintiff's] operations." (Id. ¶ 49).

# COURT'S DISCUSSION

A.     Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555.   In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." <u>Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

Federal Rule of Civil Procedure 12(f) permits the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." With respect to responses to amended pleadings, Rule 15(a) provides that "any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later."

B.     Analysis

    1.     Defendants' motion to dismiss

        a.     Economic loss rule

Defendants argue that all of plaintiff's state law tort claims must be dismissed pursuant to the economic loss rule.

"North Carolina's economic loss rule provides that 'ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor.'" Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 164 (4th Cir. 2018) (quoting N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 240 S.E.2d 345, 350 (1978)). Under this rule, a "tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract." Id. (quotations omitted). "It is the law of contract, not tort law, which defines the obligations and remedies of the parties in such a situation." Id. (quotations omitted). "Accordingly, North Carolina law requires' courts to limit plaintiffs' tort claims to only those claims which are identifiable and distinct from the primary breach of contract claim." Id. (quoting Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998)). "Only where a breach of contract also constitutes an 'independent tort' may tort actions be pursued." Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp., 15 F.3d 327, 330 (4th Cir. 1994).

Plaintiff's sixth through ninth claims are subject to dismissal under this economic loss rule, because the claims are not independent, identifiable, and distinct from the primary breach of contract claim. The conduct that forms the basis of plaintiff's sixth through ninth claims – negligence, negligence per se, nuisance, and trespass – is the same conduct that forms the basis of plaintiff's breach of contract claim. In particular, plaintiff asserts in such claims that defendants breached "a duty of care concerning [defendants'] assessment and remediation of environmental conditions at, on and from the Property," (Compl. ¶ 105), and incur liability due to "failure to assess and remediate" contamination thereon. (Compl. ¶ 158; see id. ¶¶ 152, 164). Plaintiff's breach of contract claim similarly is based upon "failure to pursue assessment and remediation" of environmental conditions "at, on and from the Property." (Compl. ¶ 132).

Plaintiff's unfair and deceptive trade practices act (UDTPA) claim (twelfth claim) also is, subject to dismissal under the economic loss rule, in that part where the claim is based upon defendants' failure to assess and remediate adequately environmental conditions at the Property. For example, plaintiff asserts, among multiple grounds for its UDTPA claim, that defendants have "delayed [in] pursuit of assessing the nature, extent and severity of the environmental impacts at, on and from the Property and remediating those impacts." (Id. ¶ 182.C.). Plaintiff asserts defendants have "not fully delineated" contamination; ceased operation of the Remediation System, and operated it beyond its useful life; decided not to conduct off-site stream sampling or vapor intrusion; and have admitted ongoing violations of state law due to contamination. (Id. ¶ 182.A., B., E., F.). All of these grounds for the UDTPA claim are co-extensive with the breach of contract claim. Indeed, plaintiff asserts in its UDTPA claim that defendants' "conduct is in or affecting commerce because, among other things, [defendants] agreed by contract to cleanup contamination and [have] failed to do so." (Id. ¶ 184). Therefore, this asserted tort conduct is subject to dismissal under the economic loss rule.

By contrast, a portion of the UDTPA claim and the entire negligent misrepresentation claim survives the economic loss rule because those remaining tort grounds are independent of plaintiff's breach of contract claim. For example, as one basis for the UDTPA claim, plaintiff asserts that defendants have "made material misrepresentations regarding [defendants'] supposed remediation efforts," and defendants "falsified the REC Program Eligibility Questionnaire Response in an effort to avoid State oversight of the remediation." (Id. ¶ 182.C.-D.). Plaintiff's negligent misrepresentation claim is based upon "numerous material misrepresentations" to plaintiff and "misrepresent[ations] to the State and to [plaintiff]" that defendants were "eligible for the REC

Program by completing and submitting the false REC Program Eligibility Questionnaire Response." (Id. ¶ 192). This asserted misrepresentation conduct is independent and distinct from the conduct comprising breach of contract: Plaintiff does not assert that defendants breached the contract by making misrepresentations such as the alleged misrepresentations in the REC Program Questionnaire Response. (See id. ¶¶ 131-133). Viewing the facts in the light most favorable to plaintiff, at this pleading stage of the case, whether defendants performed their remediation and assessment duties under the contract may be a separate question from whether defendants are liable in tort for making misrepresentations in the REC Program Questionnaire Response.

The parties' arguments inconsistent with the court's above analysis are unavailing. Plaintiff argues, for example, that defendants have an "independent duty to clean up the [P]roperty under State and federal statutes and regulations," and the court should not expand the economic loss rule to environmental contamination cases such as this involving such independent duties. (Resp. (DE 122) at 9, 15-16). But, the contract in this case requires defendants to "effect all remedial measures by law or regulation." (Compl. ¶ 130). As such, any state law tort claim based upon defendants' independent duty to remediate under state and federal law is not "identifiable and distinct from the primary breach of contract claim." Broussard, 155 F.3d at 347. The existence of independent duties arising from environmental statutes and regulations does not alter the application of the state law economic loss rule.

Plaintiff also argues that because defendants claim they are only obligated under contract to clean up the 11 acre leased parcel under the parties' contract(s), then plaintiff should be allowed to rely upon an independent duty in tort law to have defendants clean up the entire Property. This argument, however, proves the point that the dispute over clean up obligations is dependent upon

the terms of the Purchase Agreement and Letter Agreement and the interpretation thereof. Where plaintiff asserts that the Purchase Agreement and Letter Agreement obligate defendants to assess and remediate the entire Property, (see Compl. ¶ 132), then that claim encompasses any asserted independent duty owed to plaintiff under state tort law to clean up the Property.

At the other end of the spectrum, defendants' argument glosses over the distinction between plaintiff's misrepresentation claims and other tort claims. Defendants argue that plaintiff's tort claims are "premised entirely on the contamination the parties' contract addresses." (Reply (DE 128) at 1). But, the parties' contract does not, as alleged, address liability for misrepresentations made by defendants. In addition, plaintiff does not assert its breach of contract claim on the basis of misrepresentations made. Therefore, plaintiff's misrepresentation claims are distinct from and independent of plaintiff's breach of contract claim.

In sum, plaintiff's sixth through ninth claims – negligence, negligence per se, nuisance, and trespass – are dismissed under the North Carolina economic loss rule. On the same basis, those portions of plaintiff's UDTPA claim not based upon misrepresentation also are dismissed.

b.      Statute of limitations and particularity

As applicable to the remaining state tort claims of UDTPA and misrepresentation, defendants raise the issue of statute of limitations and pleading fraud with particularity. Claims of misrepresentation under North Carolina law must be pleaded with particularity, in accordance with Federal Rule of Civil Procedure 9(b). To do so, plaintiff must describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008). Plaintiff meets this standard only with respect to UDTPA

and misrepresentation claims based upon the REC Program Questionnaire Response, where plaintiff alleges the time, place, and contents of the false representations and the identity of the person making them and what was obtained thereby. (See Compl. ¶¶ 73-79; 183.D.; 192).

Plaintiff's assertion of UDTPA and misrepresentation claims based upon other asserted "misrepresentations regarding [defendants'] supposed remediation efforts" do not meet this heightened pleading standard. (See Compl. ¶¶ 183.C.; 189). Moreover, in light of suggested time period of such other misrepresentations commencing in 1987, misrepresentation claims on that basis are barred by the three-year statute of limitations in N.C. Gen. Stat. § 1-52.

By contrast, the court at this juncture declines to dismiss the UDTPA and misrepresentation claims based upon the REC Program Questionnaire Response, where defendants allegedly entered into the REC Program with the State in October 2015. (See Compl. ¶ 83). Contrary to defendants' argument, plaintiff alleges reliance by both the State and plaintiff on the misrepresentations made in entering into the REC Program (see id. at 192-193), and the court leaves for another day resolution of defendants' factual arguments regarding such reliance.

In sum, those parts of plaintiff's UDTPA and misrepresentation claims not based upon the REC Program Questionnaire Response are dismissed. Those parts of plaintiff's UDTPA and misrepresentation claims based upon the REC Program Questionnaire Response remain.

c.      Breach of Contract

Defendants argue that plaintiff fails to state a claim for breach of contract because plaintiff has not pleaded facts showing that defendants' remedial work was less than required by law. Under North Carolina law, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Crosby v. City of Gastonia, 635 F.3d 634, 645

(4th Cir. 2011) (quotations omitted).   Here, plaintiff asserts that defendants breached, inter alia, a term in the Letter Agreement requiring defendants to "effect all remedial measures required by law or regulation."  (Compl. ¶ 130).  Plaintiff has alleged defendants breached this provision of the contract by "knowingly and willfully fail[ing] to pursue assessment and remediation of the hazardous substances and other constituents it disposed of and released at, on and from the Property." (Id. at 131).  Plaintiff alleges in detail that defendants never fully defined the vertical or horizontal extent of contamination impacts, as requested by the State, (see, e.g., id. ¶¶ 34, 38, 40, 43, 46-48, 52-53, 55, 66, 73, 85); did not adequately operate the Remediation System and other remediation measures (see id. ¶¶ 70-72; 93-100, 106); and that the REC Program is inadequate to address assessment and remediation of hazardous substances on the Property. (e.g., id. ¶¶ 101, 106). These allegations are sufficient to state a claim for breach of contract.

Accordingly, defendants' motion to dismiss the breach of contract claim is denied.

d.      Punitive damages and injunction

Defendants seek dismissal of plaintiff's claims for injunction and punitive damages (tenth and fourteenth claims), on the basis that these are not causes of action.  Plaintiff recognizes that these are not independent causes of action, but argues that they are appropriately considered as part of plaintiff's prayer for relief.  Accordingly, the court will not dismiss these "claims," but will instead consider the appropriateness of punitive damages and injunction as part of plaintiff's prayer for relief.

2.      Plaintiff's motion to dismiss or strike

Plaintiff moves to dismiss or strike the counterclaims on grounds that they are untimely and improperly expand the scope of the case.

In this case, striking defendant's counterclaims under Rule 12(f) is not warranted because plaintiff has not demonstrated that the defenses are "insufficient," or "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). In addition, plaintiff has not shown good cause for striking the counterclaims under Rule 15(a). Defendants timely filed their answer and counterclaims to the third amended complaint within the time period prescribed by Rule 15(a), and Rule 15(a) does not limit the scope of new allegations which a defendant may assert in a response to an amended complaint.

The court recognizes plaintiff's argument that the court should follow a "proportionality" approach, as described in Virginia Innovation Sciences, Inc. v. Samsung Electonics Co., 11 F. Supp. 3d 622, 633 (E.D. Va. 2014), whereby an amended answer "must reflect the breadth of the changes in the amended complaint." Id.; see Elite Entm't, Inc. v. Khela Bros. Entm't, 227 F.R.D. 444, 446 (E.D. Va. 2005) ("[I]f major changes are made to the complaint, then major changes may be made to the response.").

The court declines to apply this rule under the circumstances of this case to strike the counterclaims for several reasons. First, the plain language of Rule 15 does not limit the court to following such an approach, see Fed. R. Civ. P. 15(a), and this court previously has declined on that same basis to apply the rule to strike amendments to an answer timely filed after amended complaint. See, e.g., Courter v. SSC Hertford Operating Co. LLC, No. 2:15-CV-34-FL, 2017 WL 485222, at *2 (E.D.N.C. Feb. 3, 2017).

Second, application of the "proportionality" rule advanced in Virginia Innovation does not provide a strong basis for striking the counterclaims under the circumstances of this case. Plaintiff's third amended complaint added three significant tort claims on a new theory of recovery, two of

23

which are now the only tort claims remaining as independent actionable torts, following this court's ruling herein. The new actionable claims raise substantial issues regarding alleged recent misrepresentations made related to the State REC Program agreement for remediation of contamination on the Property. The new counterclaims are in proportion to these newly added claims because they raise substantial issues whether plaintiff has contributed to contamination of the Property, including through plaintiff's recent activities on the Property. See Elite Entm't., 227 F.R.D. at 446 ("[I]f major changes are made to the complaint, then major changes may be made to the response.").

While plaintiff sharply disputes the factual basis of the counterclaims, they are appropriate for consideration in this case, even at this late juncture, because the parties are still in process of determining the full extent of the contamination on the Property, as noted in the court's order on defendants' motion to stay, (see Order (DE 159) at 6-7). Moreover, the issue of who contaminated the Property was raised not only by plaintiff's original claims but also defendants' original affirmative defenses. Proper allocation of responsibility for contamination of the Property and response costs, through adjudication of all pertinent claims and counterclaims bearing on the Property, advances the "comprehensive remedial" purposes of CERCLA. Axel Johnson, Inc. v. Carroll Carolina Oil Co., 191 F.3d 409, 416 (4th Cir. 1999).

In sum, defendants' counterclaims are allowed as a matter of right under Federal Rule of Civil Procedure 15(a). Because amendment is allowed as of right, the court does not address plaintiff's additional arguments regarding modification of the scheduling order. As noted in the court's October 17, 2017, order, "within 15 days of when the pleadings in this matter finally are settled, either party may file a motion seeking time for limited additional discovery, proposing the

time period for such discovery, the issues on which discovery is sought, with indication of the position of the other party, accompanied by proposed order if consented." (Id.). Now that the pleadings in this matter finally are settled through entry of this order, it is time to consider whether and to what extent additional discovery is necessary to prepare the claims in this action for trial, and to set a final deadline for discovery and dispositive motions.

The parties are directed to file, within 14 days of this order, a joint motion for scheduling order, by consent or setting out each parties' position separately, proposing categories of additional discovery, if any, necessary to prepare the claims in this action for trial, and proposing a final deadline for discovery and dispositive motions.

## CONCLUSION

Based on the foregoing, defendants' motion to dismiss (DE 113) is GRANTED IN PART AND DENIED IN PART, as set forth herein. Plaintiff's motion to dismiss and/or strike counterclaims (DE 127) is DENIED. The parties are DIRECTED to file, within **14 days** of this order, a joint motion for scheduling order, by consent or by setting out each parties' position separately, proposing categories of additional discovery, if any, and proposing a final deadline for discovery and dispositive motions. Thereupon the court will enter such further order regarding case scheduling as is warranted.

SO ORDERED, this the 28th day of August, 2018.

LOUISE W. FLANAGAN
United States District Judge