IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CV-543-FL

| | | |
|---|---|---|
| AVX CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| CORNING INCORPORATED; | ) | |
| COMPONENTS, INCORPORATED; | ) | |
| CORNING INTERNATIONAL | ) | |
| CORPORATION; CORNING SAS; | ) | |
| CORNING LIMITED; and CORNING | ) | |
| GMBH, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the following motions:

1)    Plaintiff's motion for summary judgment as to defendants' counterclaims (DE 178).

2)    Defendants' motion for summary judgment as to plaintiff's twelfth and thirteenth claims for

relief (DE 200).

3)    Plaintiff's motion for summary judgment as to its claims for violations of the Comprehensive

Environmental Response, Compensation and Liability Act ("CERCLA"), Unfair and

Deceptive Trade Practices Act ("UDTPA"), and for negligent misrepresentation (DE 203).

4)    Motion for summary judgment by defendants Components, Incorporated; Corning

International Corporation; Corning SAS;  Corning Limited; and Corning Gmbh, on all

claims remaining against them (DE 212).

5)    Plaintiff's motion to exclude and to strike expert evidence, and for sanctions (DE 215).

6)     Defendants' motions to exclude and to strike expert evidence (DE 217, 221, 224).

7)     Defendants' motions to strike declarations and portions of statement of facts and appendix (DE 241, 258).

8)     Plaintiff's motion to strike, to compel, and for sanctions (DE 246).

These motions have been briefed fully, and in this posture the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiff commenced this action on October 15, 2015, asserting claims for costs and damages, as well as declaratory and injunctive relief, associated with alleged environmental contamination on its property, formerly owned by defendant Corning Incorporated ("Corning") between 1962 and 1987. Plaintiff purchased the Property in 1987 as part of a multi-party "Agreement of Purchase and Sale" (hereinafter "Purchase Agreement"), executed by defendant Corning and several entities affiliated with Corning who are also defendants in this matter (hereinafter, the "secondary defendants").[1]

Plaintiff filed its operative complaint,[2] on October 13, 2017. Upon the court's dismissal of part of plaintiff's claims,[3] the following claims therein remain for adjudication:

---

[1]     Defendant Corning (formerly known as Corning Glass Works) is a New York corporation with a principal place of business in New York. The secondary defendants are the following subsidiaries of defendant Corning: 1) defendant Components, Incorporated, a Delaware corporation with a principal place of business in New York; 2) defendant Corning International Corporation, a Delaware Corporation with principal place of business in New York; 3) defendant Corning SAS (successor in interest to Corning France, S.A.), a French corporation with a principal place of business in France; 4) defendant Corning Limited, a United Kingdom Corporation with a principal place of business in England; and 5) defendant Corning GmbH, a German corporation with principal place of business in Germany.

[2]     Unless otherwise specified, all references to the "complaint" refer to the Third Amended Complaint filed October 13, 2017.

[3]     In order entered August 28, 2018, the court dismissed in part several claims asserted by plaintiff and allowed counterclaims by defendants to proceed. In particular, the court dismissed plaintiff's claims for negligence, negligence per se, nuisance, and trespass (claims six, seven, eight, and nine) under the North Carolina economic loss rule. The court also dismissed all parts of the UDTPA and negligent misrepresentation claims (claims twelve and thirteen), except for those parts based upon defendants' response to a state remedial environmental program

1)      CERCLA, 42 U.S.C. § 9607(a), for recovery of response costs (claim one);

2)      CERCLA, 42 U.S.C. § 9613(f), for contribution (claim two);

3)      Breach of contract (claim three);

4)      Federal law declaratory relief as to CERCLA liability (claims four and five);

5)      State law declaratory relief (claim eleven);

6)      UDTPA (in part) (claim twelve); and

7)      Negligent misrepresentation (in part) (claim thirteen).

Defendants filed an answer and six counterclaims, on October 27, 2017, contending that

plaintiff is responsible for additional environmental contamination on the Property, as follows:

1)      CERCLA cost recovery, contribution, and declaratory relief, claims under 42 U.S.C. §§

        9607(a)(1), 9613(f) and (g)(2) (first, second, and fourth counterclaims);

2)      Breach of contract / indemnification (third counterclaim);

3)      Federal law and state law declaratory relief (fifth and sixth counterclaims).

Plaintiff filed the instant motion for summary judgment (DE 178) as to defendants'

counterclaims on October 10, 2018, relying upon a statement of facts and appendix, with exhibits,

including the following categories of documents: 1) excerpts of depositions of current and former

employees of plaintiff and defendant Corning, as well as consultants and contractors; 2)

correspondence between the State of North Carolina (the "state")[4] and defendant Corning and its

---

questionnaire. The court also held that it will consider the appropriateness of plaintiff's "claims" for punitive damages
and injunction (claims ten and fourteen) as part of plaintiff's prayer for relief in the event plaintiff prevails on any of its
substantive claims.

[4]      For ease of reference, the "state" as used herein, refers to the state and any of its agencies, divisions,
and departments, related to environmental management, which may have been organized and named differently through
the course of the years at issue in the instant matter.

consultants; 3) environmental investigation, inspection, testing, and remediation reports; 4) contracts and agreements between the parties; and 5) inventory forms, reports, and chemical product Material Safety Data Sheets ("MSDS").

In opposition thereto, defendants rely upon a responsive statement of facts and appendix, with exhibits including in part additional excerpts from the same evidence or categories of evidence on which plaintiff relies, in addition to 1) additional correspondence between plaintiff and a product manufacturer; 2) correspondence between plaintiff and potential purchasers of the Property and consultants; 3) excerpts of expert reports and depositions of experts, as well as declarations of experts, a corporate employee, and counsel. In reply, plaintiff relies upon a supplemental statement of facts and appendix, including a list of plant employees and additional deposition excerpts.

Defendants filed the instant motion for summary judgment (DE 200) as to plaintiff's twelfth and thirteenth claims (UDTPA and negligent misrepresentation) on February 7, 2019, relying upon a statement of facts and appendix, with exhibits, including additional excerpts from the same evidence or categories of evidence filed in conjunction with the preceding summary judgment motion, in addition to: 1) correspondence between the state and plaintiff; 2) state regulations and guidelines; 3) declarations of defendant Corning's consultant, counsel, and former employee. In response, plaintiff relies upon a statement of facts and a third supplemental appendix containing additional deposition excerpts and email correspondence between defendant Corning's counsel, consultants, employees, and plaintiff's counsel and employees. Defendants replied in support of the motion.

The secondary defendants filed their motion for summary judgment (DE 212) on February 7, 2019, seeking dismissal of all remaining claims against them, relying upon a statement of facts

and appendix, with exhibits, including additional excerpts from the same evidence or categories of evidence filed in conjunction with the preceding summary judgment motions, in addition to: 1) deeds pertaining to the Property; and 2) excerpts of defendant Corning's plant documents, filings, and correspondence from period of its ownership of the property. In opposition, plaintiff relies upon an opposing statement of facts and appendix, referencing exhibits previously filed, as well as additional deposition excerpts. Defendants replied in support of the motion.

Plaintiff filed the instant motion for summary judgment (DE 203) in favor of its own claims for CERCLA relief, negligent misrepresentation, and UDTPA, relying upon a statement of facts and appendix, with exhibits, including additional excerpts from the same evidence or categories of evidence filed in conjunction with the preceding summary judgment motions, in addition to: 1) supplemental and rebuttal expert reports; 2) plaintiff's responses to defendants' discovery requests. In opposition, defendants rely upon a statement of facts and appendix, with exhibits including additional excerpts from the same evidence or categories of evidence filed in conjunction with the preceding summary judgment motions, in addition to Wake County Public Schools correspondence. In reply, plaintiff relies upon a fourth supplemental opposing statement of facts and appendix, referencing exhibits previously filed, as well as additional deposition excerpts and declaration of counsel.

Also on February 7, 2019, the parties filed motions to exclude and to strike expert testimony and evidence. In plaintiff's motion, it seeks to exclude expert testimony of defendants' designated experts, Sylvia Mancini ("Mancini") and David Duncklee ("Duncklee"), and it seeks sanctions striking all evidence and expert reports pertaining to Compound Specific Isotope Analysis ("CSIA") and defendants' counterclaims. In support of the motion, plaintiff relies upon 1) expert witness

materials related to CSIA; 2) discovery responses, objections, and correspondence between counsel; 3) declaration of plaintiff's environmental consultants, including Christopher Bonessi ("Bonessi"). In opposition, defendants rely upon two declarations of counsel, attaching exhibits related to 1) CSIA lab reports and expert analysis conducted by defendants; and 2) correspondence between the parties, counsel, and the court, regarding CSIA testing.

In defendants' motions, they seek to exclude portions of expert testimony and to strike portions of reports of Thomas Hutto ("Hutto"); R. Paul Philp ("Philp"); and Richard Royer ("Royer"). In support thereof, defendants rely upon excerpts of expert depositions and reports, as well as a declaration of defendants' environmental consultant. In opposition, plaintiff relies upon additional expert background materials and deposition excerpts, as well state regulatory guidance.

Defendants also filed the instant motion to strike declaration of Bonessi on March 7, 2019, relying upon additional expert witness exhibits. In opposition, plaintiff relies upon excerpts of expert witness materials, discovery materials, and correspondence between counsel. In conjunction with its opposition, plaintiff filed the instant motion to strike declarations, to compel, and for sanctions, on March 21, 2019, seeking to strike rebuttal expert declarations and attorney declarations filed by defendants. Defendants responded in opposition to plaintiff's March 21, 2019, motion to strike, and plaintiff replied in support.

On April 8, 2019, defendants filed the instant motion to strike plaintiff's third supplemental statement of undisputed facts and appendix thereto and second declaration of Bonessi, which plaintiff filed in support of its summary judgment motion. Plaintiff responded in opposition, and defendants replied.

Plaintiff filed a notice on May 10, 2019, attaching a state notice of violation sent to defendant Corning. With leave, defendants filed a response to the notice and plaintiff replied.

## STATEMENT OF THE FACTS

The undisputed facts may be summarized as follows. From around 1962 to 1987, defendant Corning, then known as Corning Glass Works, owned and operated a manufacturing facility (the "plant") at the property located at 3900 Electronics Drive in Raleigh, North Carolina (the "Property"). (Defs' Resp. Stmt. (DE 195) ¶ 1).[5] Defendant Corning "used TCE at the Property during a period of its ownership of the Property." (Id. ¶ 2). During this time, "contamination to soil and groundwater occurred in the vicinity of a dry well approximately 200 feet south" of the plant. (Id.).

According to a 1986 "Material Safety Data Sheet" ("MSDS") in plant files, TCE is also known as "Trichloroethylene," or "1,1,2-Trichloroethylene," among other trade names or chemical synonyms. (DE 182 at 246).[6] According to this MSDS, it is a "colorless, heavy, mobile liquid with a mild chloroform-like odor." (Id.). Also according to this MSDS, TCE has several characteristics of "toxicity" including "mutagenic," "reproductive effects," "positive animal carcinogen," and "indefinite human carcinogen," as well as "skin irritant and a central nervous system depressant." (Id. at 247-248).

On September 5, 1987, plaintiff, which is a Delaware corporation with principal place of business in South Carolina, entered into the Purchase Agreement, which provides terms for the sale

_____

[5] Where facts set forth in the parties' statements of material facts are not disputed, the court cites to responsive statement confirming lack of dispute.

[6] Page numbers in citations to record documents, with a corresponding docket entry "DE" number indicated, reference the page number specified in the court's electronic case filing system and not the page number or party appendix page number showing on the face of the underlying document, if any.

of certain properties and assets of defendant Corning and the secondary defendants, including the Property, to plaintiff. (Purchase Agreement, p. 1 & § 2.1 (DE 181 at 318, 323-324)).[7] The Purchase Agreement includes the following provision regarding "Liabilities to be Retained," stating, in pertinent part as follows:

> The Corning Parties[8] shall retain, and shall be responsible for paying and satisfying the following liabilities and obligations (the 'Retained Liabilities'):
>
> \*      \*      \*
>
> (d)      In connection with the operation of the Corning Electronics Business and the Assets,[9] all liabilities for violations of environmental laws . . . applicable to such operation, which violations existed, or are based upon conditions that existed, prior to the Closing Date[10] and to the extent such violations are not attributable to or otherwise adversely affected by either of the Purchasers' actions.

(Id. § 3.3 (DE 181 at 332-333). The Purchase Agreement also provides for "Indemnification" by defendant Corning to plaintiff "from and against any and all claims, liabilities, losses, damages, costs and expenses, including reasonable counsel fees . . . arising out of, or relating to . . . any Retained Liabilities." (Id. § 12.1 (DE 181 at 360)).

---

[7]      The agreement also includes terms for purchase by third-party Vishay Intertechnology, Inc., of certain assets and properties of defendants not pertinent to the instant matter. (E.g., Purchase Agreement p. 1 & §§ 2.3-2.4).

[8]      The "Corning Parties" is defined to include all the defendants to the instant action, or their predecessors in interest (e.g., Corning Glass Works, predecessor in interest to defendant Corning; Corning France, S.A., predecessor in interest to defendant Corning SAS; defendant Components, Incorporated; defendant Corning International Corporation; and defendant Corning Limited), except for defendant Corning Gmbh, which was added to the Purchase Agreement by a November 10, 1987, amendment to the Purchase Agreement. (DE 181 at 318, 404; see also Answer (DE 116) ¶¶ 13, 16).

[9]      The "Corning Electronics Business" and "Assets" are defined to include, in pertinent part, the Property and the plant, and plant machinery, as well as "the business of manufacturing and distributing capacitors currently conducted at the [plant]." (Purchase Agreement §§ 1.1, 1.8, 1.9, 2.1).

[10]      The "Closing Date" designated at that time in the Purchase Agreement was November 2, 1987, or no later than January 31, 1988. A November 10, 1987, amendment to the Purchase Agreement designated the closing date as November 10, 1987.

In 1987, "during due diligence to acquire the Property then being operated by Corning, [plaintiff] sent an environmental consultant, Mary Elizabeth Ford ('Ford'), to conduct an environmental audit." (Defs Resp. Stmt. (DE 195) ¶ 24). "Ford was employed as an in-house environmental consultant by Nixon Hargrave[,] [plaintiff's] New York law firm." (Id. ¶ 25). In a November 5, 1987, "Office Memorandum," (the "Ford Memo"), Ford summarized results of a "soil vapor survey" conducted by another consulting firm, "H&A," including the following observations:

[1]     During testing in the vicinity of the dry well near the chemical storage building,[11] a significant amount of contamination was detected. While a number of compounds were observed, the most significant appear to be chlorinated solvents. One of the compound peaks had a retention time (which is the way a compound's identity is determined) very similar to trichloroethene [sic] ('TCE') although, it is possible that it may be freon or both TCE and [f]reon. Levels near the dry well taken from the surface were generally in the range of 800 ppb to 1,000 ppb (1 ppm).

[2]     The 'dry well' was later pulled out of the ground by a backhoe. The dry well consisted of a concrete pipe approximately 8 inches in diameter and about 4 feet long. The area around and beneath the dry well were also excavated. Based upon this excavation, there is no indication that there ever had been any 'floor' to the dry well. The soil immediately below the dry well had a red clayey appearance, although it also had gravel and other material in it so it was not purely clay. The removed soils had a very strong odor, easily detected from one hundred feet away. A soil vapor probe hole was placed in the bottom of the excavation (hence the sampling depth was approximately 6-8 feet below ground level. The soil vapor reading indicated approximately 80-100 parts per million (80,000-100,000 ppb) of one or more chlorinated solvents.

---

[11]     There is not a site plan, map, or diagram, included with the Ford Memo in the record. There are, however, a number of maps in the record generated around and after the time of the Ford Memo showing the undisputed locations of various items and locations referenced in the Ford Memo. For illustrative purposes, the court includes as appendices to this order multiple maps generated in environmental reports and assessments from November 1987 up to the time of the litigation in the instant case, which maps collectively show the locations of the plant, dry well, and other buildings and features on the Property, with later maps also showing locations of monitoring wells and remediation wells later installed on the Property. See Order Appendix 1, for a map drawn by the state, showing approximate location of dry well, chemical storage building, and plant, at the Property; see Order Appendix 2 for a contour map showing surrounding area.

[3]     Upon learning that one of the higher concentration compounds "looked" very similar to TCE, I questioned plant personnel further and learned that TCE had been used in a small vapor degreaser operation from approximately 1965 to 1972. I spoke with Clark Wormer, shift foreman for the resistor line (where two small TCE vapor degreasers were located) during this timeframe. He had no recollection of how often the degreasers were used, how often they were cleaned out, or what was done to the material that was removed from the degreaser. In all the other samples we did on the property, however, we saw no other indications of any significant TCE contamination.

[4]     Since the area that appeared to [the] 'upgradient' of the dry well had higher surficial readings than the area 'downgradient' of the dry well, I questioned plant personnel further as to possible explanations. I learned that, some time ago, 'empty' drums were stored on a concrete pad on the east side of the chemical storage building until they were sent off-site for disposal. Since the 'triangular' fingerprint of contamination in this area extends back to the pad and the building, it is a safe assumption that at least some of the contamination we detected was due to runoff from this concrete pad and former drum storage area, as well as from the former dry well.

[5]     While we were able to generally determine the surficial area impacted, the deeper soils apparently have higher levels of contamination than do the shallower soils and thus the overall size of the impacted area may be much larger than the triangular pattern identified during the soil gas survey. Likewise it is impossible at the juncture to gauge how deep the contamination goes or whether (and in what levels) it has reached the underlying ground water (judged to be approximately 20 feet or deeper beneath ground surface near the former drywell).

(DE 182 at 229-235).

On November 10, 1987, on or near the time of closing on the sale of the Property, plaintiff and defendant Corning entered into a letter agreement ("Letter Agreement") "to confirm and amplify the respective rights and obligations of [defendant] Corning and [plaintiff] under the [Purchase Agreement," including in reference to "the possibility that certain sites located on the [Property] as identified" on a "Schedule A" thereto, in pertinent part "[t]he area in the vicinity of a certain dry well near a chemical storage building on the [Property]."     (DE 181 at 380, 383).  Therein, defendant Corning "agrees to effect all remedial measures required by law or regulation with respect

to" circumstances described in the Letter Agreement, and provides additional terms for indemnification in conjunction with § 12.7 of the Purchase Agreement. (Id. at 381).

In a November 1987 pollution incident reporting form, the state noted that "[a]n injection well (concrete sump) tied to floor drains in virgin solvent storage shed was discovered during an environmental audit; preliminary soil sample analysis indicates high concentrations of chlorinated hydrocarbons." (DE 181 at 452). It also noted that as of November 16, 1987, "concrete casing has been removed [from the dry well] and soil gas survey has been initiated; will begin soil removal and investigation." (Id. at 454). It also included a site map of the incident area. (Id. at 455; see Order Appendix 1). In a November 25, 1987, letter to defendant Corning, the state requested that defendant Corning "initiate steps to mitigate this incident . . . includ[ing] determining the vertical and areal extent of any soil and groundwater contamination." (DE 181 at 61).

In a December 7, 1987, report, H&A summarized results of its "soil vapor investigation," noting that "[s]ampling was conducted by advancing a small diameter probe 2 to 3 ft. below the ground surface . . . to obtain a small volume of soil vapor." (DE 196 at 7). "Sampling at increasing distances from the drywell/chemical storage building down the drainage swale to the south showed consistently decreasing levels of . . . TCE." (DE 196 at 8). In addition, H&A noted, "[o]f the several other areas on the site tested none appeared to show significantly elevated concentrations of volatile organic compounds," such as TCE. (Id.). The report included a list of sample readings, as well as a map showing the location of samples taken. (Id. at 10-11; see Order Appendix 3). A Nixon, Hargrave "Report on the Preacquisition Environmental Audits" noted that "other than [this] soil gas survey limited to areas having some indications of contamination, no soil or water testing

was conducted." (Nixon, Hargrave, Devans & Doyle, Report of Pre-acquisition Audit (DE 182 at 283)).

A March 2, 1989, Law Environmental, Inc., report submitted to defendant Corning provided initial "data and information for hydrogeological characterization" for the Property. (DE 181 at 31). It provides information on three "ground-water monitoring wells" that were constructed in January 1989 "to monitor for industrial solvents in ground-water," with a map showing the locations of the monitoring wells denominated "MW-1," which is upgradient of both the chemical storage building and the dry well, and "MW-2" and "MW-3", which are "downgradient." (DE 181 at 36, 41, 42, 56; see Order Appendix 4). It also provides information on levels of TCE detected at each of the monitoring wells, including "MW-1." (DE 181 at 37-38, 42, 46-48, 50-52, 56).

A June 14, 1989, Law Environmental, Inc., report submitted to defendant Corning stated that 537.8 tons of "contaminated soil" were removed from the vicinity of the former dry well between May 8, 1989, and May 16, 1989, and that "soils remain that exceed [state] concentration levels for volatile organics." (DE 201-2). The state suggested in August 3, 1989, letter to defendant Corning that concerns remained "that the residual levels of contamination may provide a continuing release to the groundwater," and "[t]his may require Corning to provide an impermeable cap to reduce migration and a groundwater recovery system." (DE 201-3 at 2).

In accordance with a "Remedial Action Plan," dated September 25, 1991, defendant Corning began remediation of groundwater at the Property in 1992, operating a "pump and treat system" continuously from that date through November, 2008, with a suspension from July 1996 to January 1997. (DE 201-4 at 6; 201-4 at 27). In 1993 defendant Corning leased from plaintiff for $1 per year a portion of the property (the "Outparcel") to enable it to install and operate the pump and treat

system. (DE 206 at 35-37, 77; <u>see</u> Order Appendix 5 (showing Outparcel as "Site Boundary"). On June 11, 2012, AMEC submitted a report to defendant Corning stating that "Corning/AVX opted to stop operation of the full time pump and treat groundwater remediation system in anticipation of entering the [REC] Program." (DE 201-4 at 27).

On June 28, 2012, AMEC submitted a "Data Gap and Remediation Strategy" report to defendant Corning (hereinafter, the "Data Gap Report") that contained the following conclusions about the need for further assessment of contamination:

> [1]    Based on the data obtained, additional assessment is required to delineate the vertical and lateral extent of the [subject contaminants] in the [specified groundwater] zones, as well as to determine the horizontal limit of impact in the shallow saprolite aquifer. In addition, it needs to be determined if the [subject contaminants] have migrated off the property and if the concentrations of [subject contaminants] present a vapor intrusion threat to the residential properties to the east. . . . Additional surface water testing is necessary off-site to determine concentrations in the surface water in the residential areas.

> [2]    The soil data collected as part of this data gap evaluation demonstrated that minor concentrations of [subject contaminants] remain in the former excavation area. . . .

> [3]    A vertical downward groundwater flow gradient was measured in deep saprolite to [specified groundwater] wells and deeper into bedrock. This indicates that contamination is being transported deeper. The vertical extent of the [subject contaminants] impact has not been defined. Horizontal groundwater movement in shallow and deep saprolite zones indicate groundwater to surface water pathways are present and that off-site groundwater impact is highly possible with vapor intrusion issues yet to be evaluated that could impact off-site residents. . . .

> [4]    The remediation strategy and cost evaluation was based on the incomplete vertical and horizontal definition of the groundwater plume. Soil remediation was determined to not be a major factor in selection of a remediation technology for the site, unless additional source areas are found at a later date. . . .

[5]     The groundwater site pump and treat system should be operated in a limited capacity to further detain plume movement off site until a permanent treatment solution is implemented, or until it is known that no off-site impacts to human health are present (i.e., via surface water exposure, vapor intrusion, etc.).

[6]     The site should be moved into the [REC] program to complete [remedial investigation] activities and begin remedial activities. The [remedial investigation] activities should be completed to confirm there is no threat to nearby residences either due to the intrusion of vapors, or exposure to impacted surface water. Prior to implementation of any remediation strategy, the extent of impact must be defined in groundwater. . . .

(DE 181 at 488-489). Around that time, "[t]he decision was made to not enter the [REC] Program and to repair and reactivate the remediation system," which was reactivated in March 2013. (DE 201-4 at 49). Also in 2013, plaintiff ceased manufacturing operations at the plant and closed the plant. (Himberger Dep. 7).[12]

On September 12, 2013, the state sent defendant Corning a "Notice of Regulatory Requirements for Contaminant Assessment and Cleanup," which stated:

To comply with the requirements of State law, a Site Cleanup Questionnaire . . . must be completed and returned to this office. The information you provide will be reviewed along with other information to prioritize the site, so please make certain that the information you provide is complete and accurate.

(Defs' App'x (DE 206) 689-690). It further stated:

[P]ersons who move forward to assess and remediate contamination, without being compelled to do so through formal legal action filed against them, are called 'volunteers.' To participate in the voluntary cleanup program, you will be required to enter into an administrative agreement with [the state]. The voluntary cleanup will proceed through the [REC Program] or under direct oversight by the [state agency].

(Id. at 690). It then described the REC program as follows:

_____

[12]     Page numbers in citations to depositions reference the page number shown on the face of the deposition transcript, and not page numbers of a particular docket entry (DE) number, where excerpts of depositions in some instances are filed in multiple locations in the record.

The [state] has a privatized oversight arm of the voluntary cleanup program known as the Registered Environmental Consultant ('REC') program. Based on the responses provided on the questionnaire (degree of hazard and public interest in the site), the [state] will determine whether a staff person or an REC will perform the oversight and approval of your assessment and cleanup action. Please note that having one or more of the conditions identified on the questionnaire does not necessarily preclude the site for qualifying for an REC-directed cleanup action.

(Id. at 690-691).

In response to this state directive, defendant Corning sent the state a "Site Cleanup Questionnaire Response" (hereinafter the "REC Program Questionnaire Response"), which contained the following responses to seven questions posed:

[1] "Are site surface soils known to be contaminated? - NO"

[2] "Is site sediment or surface water known to be contaminated? - NO"

[3] "Are hazardous vapors, air emissions or contaminated dust migrating into occupied residential, commercial or industrial areas? If yes, or unknown, please explain on separate page. – NO"

[4] "Have hazardous substances known to have migrated off property at concentrations in excess of [state] unrestricted-use remediation goals? If yes, or unknown, please explain on a separate page. – NO"

[5] "Has the local community expressed concerns about contamination at the site? – NO"

[6] "Based on current information, are there any sensitive environments located on the property? If yes, or unknown, please explain on a separate page. – NO"

[6] "Based on current information, has contamination from the site migrated into any sensitive environments? If yes, or unknown, please explain on a separate page. – NO"

(Pl's Stmt. of Facts (DE 234) ¶ 26; see Defs' App'x (DE 206) 702-704)).

On or about March 10, 2014, the state sent Corning a "Notice of REC Program Eligibility," which stated, in part:

> Thank you for submitting the Site Cleanup Questionnaire (Questionnaire) for the above subject site (Site) and the follow-up Report of 4th Quarter Groundwater Monitoring 2013 prepared by AMEC Environment & Infrastructure, Inc. The Inactive Hazardous Sites Branch (Branch) has completed review of the Questionnaire and determined that the Site can be cleaned up through the Registered Environmental Consultant (REC) Program without direct oversight by Branch Staff. Only the sites with the highest risks receive direct oversight by state staff.

(Pl's Stmt. of Facts (DE 234) ¶ 43; Defs' App'x (DE 206) 735-36).  On October 8, 2015, defendant Corning entered into a REC Program Administrative Agreement with the state.  (Pl's Stmt. of Facts (DE 234) ¶ 44; Defs' App'x (DE 207) 1156-73).

In or about March 2016, plaintiff demolished the plant building, but not the concrete slab underlying the building.  (See Duncklee Decl. ¶ 3 (DE 199 at 263)).  On June 2, 2016, the state noted in letter to plaintiff that the United States Environmental Protection Agency ("EPA") had informed the state of plaintiff's anticipated "demolition and redevelopment activities" at the Property. (DE 198 at 229). The letter encouraged plaintiff "to perform a thorough environmental assessment prior to conducting any future demolition or redevelopment activities at the [Property] to determine current site conditions."  (Id.).  The letter stated that a "thorough assessment of the [Property] is critical . . . to ensure that . . . activities conducted on [the Property] do not cause any contaminants to migrate off-property or to areas of the [Property] not previously impacted." (Id.).  The letter also recommended that plaintiff "consider undertaking a voluntary cleanup action to address any contaminated areas not currently being addressed by [defendant] Corning" under the REC Program. (Id.).

In a June 2, 2016, email, the EPA questioned whether "[e]xposing source areas (if there are any) under the slab could potentially cause impacts to the stream and/or change the TCE plume in the groundwater?" (DE 198 at 231).  In a June 22, 2016 email, the EPA noted that "[t]he reports that

[plaintiff] provided do[] not demonstrate that the sub-slab area of the building has been thoroughly assessed," and it reiterated "concern for potential source areas of chlorinated solvents that may exist under the slab." (DE 198 at 234). It further "strongly encourage[d]" plaintiff to enter the REC program, and it cautioned against "removal of the slab prior to a thorough assessment . . . as it could exasperate [sic] a problem." (Id.).

In July 2016, plaintiff's consultant, Arcadis, concluded that it "believes that removal of the slab before assessment of the sub-slab soil is both a technically sound and preferred approach." (DE 182 at 331). Plaintiff removed the concrete slab for the main floor and basement in October and November 2016. (DE 198 at 257). According to Arcadis, soil samples taken after slab removal detected "TCE, primarily in the western half of the basement area." (Id. 259). Plaintiff also excavated soil in the area where a "blue-green substance was identified below the concrete slab on the western side of the main floor." (Id. at 257). The removal of slab and excavation of soil left a exposed basin that filled with rainwater during April 2017. (DE 198 at 291).

On November 9, 2017, the state issued an enforcement order that determined that defendant Corning's REC Program Questionnaire Response included several misrepresentations. Where the response indicated that "surface water was not known to be contaminated," this was not true because Registered Site Manager ("RSM"), Daniel Shields, was aware of "documented surface water contamination." (DE 182 at 15). Where, the response answered "no" to the question "Have hazardous substances known to have migrated off property . . . ?" this was not true because the RSM was aware of "documented . . . groundwater quality exceedances" at the property and such "groundwater was flowing toward the property boundary." (DE 182 at 16).

In October 2018, defendant Corning's REC Program engineer, Wood Environmental & Infrastructure Solutions, Inc. ("Wood"), prepared a remedial investigation report pertaining to a 9.63-acre portion of the Property that is subject of the REC Program Administrative Agreement (the "AA-Site"). According to the Wood report "[a]lthough the AA-Site conditions are well defined and understood, extensive data . . . document that other source areas of volatile organic compounds (VOCs) and other [contaminants of concern] are present in the soil and groundwater under and about the footprint of the former [plant] located to the north of the AA-Site." (DE 199 at 11). It also noted that "without [the state's] assistance to require [plaintiff] to address its upgradient source areas beneath the [former plant], Corning will not be able to fully remediate subsurface [contaminants of concern] impacts at the AA-Site." (Id.).

On May 10, 2019, the state issued a notice of violation to defendant Corning based upon the statements in the REC Program Questionnaire Response as detailed in prior enforcement orders, stating: "Corning made false statement(s), representations or certifications in violation" of REC Program rules. (DE 263-1 at 1-2).

Additional facts pertinent to each of the claims are set forth in the analysis below.

## COURT'S DISCUSSION

A.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir.

2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.      Analysis

1.      Plaintiff's Twelfth and Thirteenth Claims

Defendants move for summary judgment on plaintiff's twelfth and thirteenth claims, for negligent misrepresentation and UDTPA. Plaintiff's motion for summary judgment on its own claims also concerns in part the same claims. For the following reasons, defendants' motion as to these claims is granted and plaintiff's motion as to these claims is denied.

"The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." Raritan River Steel Co. v. Cherry, Bekaert & Holland, 322 N.C. 200, 206 (1988). To establish a UDTPA claim based on a misrepresentation, a plaintiff must show "actual reliance" on the misrepresentation and that such reliance was the proximate cause of the injury. Arnesen v. Rivers Edge Golf Club & Plantation, Inc., 368 N.C. 440, 452 (2015); Bumpers v. Cmty. Bank of N. Virginia, 367 N.C. 81, 88 (2013).

Here, plaintiff's negligent misrepresentation and UDTPA claims fail because plaintiff has not demonstrated a genuine issue of material fact that it actually relied upon the alleged misrepresentations forming the basis of the claims. In its August 2018 order, the court limited plaintiff's negligent misrepresentation and UDTPA claims to the allegation that defendants "falsified the REC Program Eligibility Questionnaire Response in an effort to avoid State oversight of the remediation," and completed and submitted "the false REC Program Eligibility Questionnaire

Response." (Order (DE 164) at 18-19 (quoting Compl. ¶¶ 182, 192); see also id. at 21 ("Those parts of plaintiff's UDTPA and misrepresentation claims based upon the REC Program Questionnaire Response remain.").

Plaintiff has not demonstrated it relied on defendants' alleged misrepresentations in the REC Program Questionnaire Response. Indeed, it is undisputed that plaintiff did not receive, see, or review the REC Program Questionnaire Response when it was submitted to the state. (See Pl's Stmt. of Facts (DE 234) ¶¶ 28-31, 34, 36-40, 42; Pl's Resp. pp. 12-13). These undisputed facts preclude as a matter of law a determination that plaintiff actually relied upon the misrepresentations in the REC Program Questionnaire Response. See Arnesen, 368 N.C. at 452.

Plaintiff suggests nonetheless that it relied more generally upon defendants' entry into the REC program to its detriment. Plaintiff asserts that defendants "requested AVX's consent for Corning to enter the REC Program after having gained eligibility under false pretenses." (Pl's Stmt. of Facts (DE 234) ¶ 36) (emphasis added). According to plaintiff, it "gave that consent in reliance on Corning's supposed truth and honesty in gaining eligibility to enter the REC Program." (Id.). But, the fact that the state granted defendants eligibility to enter into the REC Program is not a misrepresentation. It is an undisputed fact that the state granted defendants eligibility to enter into the REC program. (Id.). While plaintiff may have relied to its detriment upon defendants' entry into the REC program, this is not the misrepresentation that forms the basis for plaintiff's negligent misrepresentation and UDTPA claims.

Plaintiff also suggests that it may proceed on a theory of "indirect reliance." (Pl's Resp. 15). According to plaintiff, "[i]t is sufficient to extend the duty of care to a third party if the entity preparing the statement: (1) knows that the third party will rely on its accuracy; and (2) knows that

the third party would rely on the information, or knows the recipient intended to supply the information to a third party who would rely." (Id. (citing Raritan, 322 N.C. at 214; Anneson, 368 N.C. at 467 (Hudson, J., concurring in part and dissenting in part)).

The North Carolina Supreme Court has recognized potential liability for "Information Negligently Supplied for the Guidance of Others" as follows:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) The liability stated in Subsection (1) is limited to loss suffered
>
>> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>>
>> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Raritan, 322 N.C. at 209 (quoting Restatement (Second) of Torts § 552 (1977)) (emphasis added). For example, "under the Restatement approach[,] an accountant who audits or prepares financial information for a client owes a duty of care not only to the client but to any other person, or one of a group of persons, whom the accountant or his client intends the information to benefit; and that person reasonably relies on the information in a transaction, or one substantially similar to it, that the accountant or his client intends the information to influence." Id. at 210 (emphasis added). "If the requisite intent is that of the client and not the accountant, then the accountant must know of his client's intent at the time the accountant audits or prepares the information." Id.

This standard recognized in <u>Raritan</u> is inapposite in several respects based upon the language emphasized above. First, there is no plausible basis to infer that defendants "supplie[d] false information for the guidance of others in their business transactions" in submitting the REC Program Questionnaire Response. <u>Id.</u> at 209. Rather, defendant Corning submitted the REC Program Questionnaire Response to the state directly in response to the state's request to defendant Corning. Second, there is no plausible basis to infer that plaintiff was "the person . . . for whose benefit and guidance [the defendant] intend[ed] to supply the information or knows that the recipient intend[ed] to supply it." <u>Id.</u> Defendant Corning supplied the information to the state, and there is no evidence that defendants intended to supply it to plaintiff or knew that the state intended to supply it to plaintiff. Moreover, there is no plausible basis to infer that defendants intended to supply "the information" – that is, the actual asserted misrepresentations – to plaintiff or to have the state supply that information to plaintiff. <u>Id.</u>

Plaintiff argues that it has demonstrated "indirect reliance" due to the "special and unique" nature of the REC Program in which defendants and the REC/RSM "are all in a position of trust and confidence in addressing site conditions and protecting the property." (Pl's Resp. (DE 233) 16). But, recognition of the special and unique position of trust and confidence defendants owed to the state as part of entry into the REC Program does not establish the same position of trust and confidence to plaintiff. In addition, the asserted special and unique position of trust and confidence under the REC Program does not bring defendants' conduct within the "indirect reliance" rule of <u>Raritan</u>. Indeed, plaintiffs cite no case in which a court has found "indirect reliance" under circumstances, as here, where a plaintiff never received, saw, or reviewed, asserted misrepresentations made by a defendant to a third party.

Notably, plaintiff cites to a portion <u>Anneson</u>, (<u>see</u> Pl's Resp. (DE 233) 15 (citing 368 N.C. at 467), where the <u>dissenting judge</u> would have limited the holding in <u>Raritan</u>, followed an earlier North Carolina Court of Appeals case, and allowed claims of negligent misrepresentation and UDTPA to proceed. <u>See</u> 368 N.C. at 467, 475 (Hudson, J., dissenting in part). By contrast, the majority in <u>Anneson</u> held in pertinent part that a defendant appraiser was not liable to a purchaser of real property, where, in pertinent part, the plaintiff failed to show actual reliance upon asserted misrepresentations in an appraisal report submitted to a bank. <u>See</u> 368 N.C. at 454-455.

Plaintiff also cites to <u>Marcus Bros. Textiles v. Price Waterhouse, LLP</u>, 350 N.C. 214, 220 (1999). However, in <u>Marcus Bros.</u>, there was a genuine issue of material fact that plaintiffs had actually seen the audited financial statements at issue. In particular, the court noted plaintiff's claim that the "financial statement audited by Price Waterhouse contained several material misrepresentations and reflected numerous departures from Generally Accepted Accounting Principles . . . and that Price Waterhouse's <u>failure to alert readers of the financial statement</u> to those departures violated Generally Accepted Auditing Standards." 350 N.C. at 216–17 (emphasis added). In addition, the court noted that "Piece Goods [the client of the auditor] has been sending its audited financial statements to Marcus Brothers [the plaintiff] since 1983, and that these financial statements were regularly used in determining whether to extend credit to Piece Goods." <u>Id.</u> at 221. The court "conclude[d] it can reasonably be inferred that Price Waterhouse knew Piece Goods regularly provided copies of its financial statements to a limited group of major trade creditors, of which group Marcus Brothers was a member." <u>Id.</u> at 224.

In sum, the cases cited by plaintiff undermine, rather than support, its theory of relief. Plaintiff's twelfth and thirteenth claims for negligent misrepresentation and UDTPA fail as a matter

of law because plaintiff cannot demonstrate a genuine issue of material fact that it relied upon defendants' asserted misrepresentations. Therefore, defendants' motion for summary judgment as to these negligent misrepresentation and UDTPA claims (DE 200) is granted, and plaintiff's motion for summary judgment (DE 203) is DENIED in that part pertaining to these same claims.

    2.       Secondary Defendants

        a.      CERCLA Claims Against Secondary Defendants

The secondary defendants move for summary judgment on plaintiff's CERCLA claims against them (claims one, two, four, and five), on the basis that they are not potentially responsible persons ("PRPs") under CERCLA.

Plaintiff must establish as an element of each of its CERCLA claims that the secondary defendants are PRPs, through proof that they were owners of the Property, engaged in operations at the Property, or arranged for the disposal of hazardous substances at the Property. See 42 U.S.C. § 9607(a) (providing liability for "the owner and operator" and "any person who . . . arranged for disposal or treatment"); 42 U.S.C. § 9613(f)(1) (providing right to "seek contribution from any other person who is liable or potentially liable under [§ 107(a)]"); 42 U.S.C. § 9613(g)(2) (allowing for relief in the form of "declaratory judgment on liability for response costs" in an action for recovery of response costs under § 107(a)); PCS Nitrogen Inc. v. Ashley II of Charleston LLC, 714 F.3d 161, 167 (4th Cir. 2013) (stating that for a cost-recovery claim under § 107(a) of CERCLA, 42 U.S.C. § 9607(a), plaintiff must establish "the defendant is a potentially responsible person ('PRP')").

Here, it is undisputed that the secondary defendants "did not own the Property, operate the manufacturing facility at the Property, or dispose of hazardous substances at the Property." (Pl's Resp. Stmt. of Facts (DE 232) ¶¶ 2-6). Therefore, plaintiff's CERCLA claims against the secondary

defendants fail as a matter of law, and their motion for summary judgment must be granted in this part.

Plaintiff nonetheless asserts that its CERCLA claims may proceed against the secondary defendants on the basis that they agreed in the Purchase Agreement to "'be responsible for paying and satisfying' liabilities and obligations for the violation of environmental laws at the Property." (Pl's Resp. (DE 231) at 13 (quoting Sept. 5, 1987, Agreement of Purchase and Sale [Purchase Agreement] (DE 181) at 332). This assertion, however, is a claim under contract law that the secondary defendants are liable to plaintiff by virtue of a contract, the Purchase Agreement, not by virtue of establishing the elements of a CERCLA claim. The court addresses plaintiff's grounds for contract liability against the secondary defendants in the next section. Plaintiff's instant assertion of liability based upon the Purchase Agreement does not support the CERCLA claims it pleaded, which are premised upon establishing the necessary element that the secondary defendants are owners, operators, or arrangers at the property. (See, e.g., Compl. ¶¶ 112-113, 121).

Cases cited by plaintiff are not to the contrary. In each, the court addressed the issue whether one party was liable to another by virtue of an indemnification agreement or other contract for assumption of environmental liabilities, under state law principles of contract interpretation and enforcement. See, e.g, Olin Corp. v. Consol. Aluminum Corp., 5 F.3d 10, 15 (2d Cir. 1993) ("The parties agree that New York state law is to be applied in interpreting these [indemnification] Agreements."); United States v. S.C. Recycling & Disposal, Inc., 653 F. Supp. 984, 1013 (D.S.C. 1984) ("[A]s between private parties, liability may be dealt with contractually in such manner as the parties agree.") aff'd in part, vacated in other part sub nom. United States v. Monsanto Co., 858 F.2d 160 (4th Cir. 1988); U.S. Bank Nat. Ass'n v. U.S. E.P.A., 563 F.3d 199, 205–06 (6th Cir. 2009)

(examining "[u]nder Ohio law" whether an agreement between the parties assigned "liability for all hazardous substance disposal" under certain conditions).

In sum, plaintiff's CERCLA claims against the secondary defendants (first, second, fourth, and fifth claims) fail as a matter of law and must be dismissed. The secondary defendants' motion for summary judgment thus is granted in this part.

### b.     Breach of Contract Claim Against Secondary Defendants

The secondary defendants move for summary judgment on plaintiff's breach of contract claim (claim one) and state law declaratory relief claim (claim eleven) against them, on the basis that they are not obligated to plaintiff by the relevant contractual provisions.

The elements of a breach of contract claim under New York law[13] are "the existence of a facially valid contract, breach and damages." Mercantile & Gen. Reinsurance Co., plc v. Colonial Assur. Co., 624 N.E.2d 629, 630 (N.Y. 1993). "[W]ritten agreements are construed in accordance with the parties' intent[,] and the best evidence of what parties to a written agreement intend is what they say in their writing." Schron v. Troutman Sanders LLP, 986 N.E.2d 430, 433 (N.Y.2013) (internal quotations omitted). "As such, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Id. (internal quotations omitted).

---

[13]     The parties cite both New York law and North Carolina law for principles of contract law governing plaintiff's breach of contract claim. The Purchase Agreement, which is the primary contract under which plaintiff bases its contract claim against the secondary defendants, states that it shall be "construed under and in accordance with the laws of the State of New York." (DE 181 at 376). By contrast, the Letter Agreement, which applies specifically to defendant Corning, and the Property in Raleigh, North Carolina, does not mention choice of law. (DE 181 at 380-383). Although the parties do not identify any material difference between North Carolina and New York contract law as applicable to the instant motion, defendants apply New York law specifically with respect to indemnification agreements. (See Reply (DE 253) at 5). Accordingly, for purposes of the instant motion, the court applies New York law.

"The entire contract must be reviewed and particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 920 N.E.2d 359, 363 (N.Y.2009) (quotations omitted). "[W]hen considering isolated, potentially conflicting provisions, so long as a contract 'makes clear the parties' over-all intention,' a court 'should then choose that construction which will carry out the plain purpose and object of the agreement.'" PCS Nitrogen, 714 F.3d at 173 (quoting Kass v. Kass, 696 N.E.2d 174, 181 (N.Y. 1998)). "In harmonizing provisions, however, 'no provision of a contract should be left without force and effect.'" Id. (quoting Muzak Corp. v. Hotel Taft Corp., 133 N.E.2d 688, 690 (N.Y. 1956)).

"While the meaning of a contract is ordinarily a question of law, when a term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact." Amusement Bus. Underwriters, a Div. of Bingham & Bingham, Inc. v. Am. Int'l Grp., Inc., 489 N.E.2d 729, 732 (N.Y. 1985). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170-71 (N.Y. 2002). "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent or where its terms are subject to more than one reasonable interpretation." Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 37 N.E.3d 78, 80 (N.Y. 2015) (internal quotations omitted). "Ambiguity is present if language was written so imperfectly that it is susceptible to more than one reasonable interpretation." Brad H. v. City of New York, 951 N.E.2d 743, 746 (N.Y. 2011).

Plaintiff asserts several theories of breach of contract in the complaint, for which plaintiff has not demonstrated a genuine issue of material fact as to liability for the secondary defendants. First, plaintiff asserts that "Corning," defined in the complaint as all defendants, "failed to pursue assessment and remediation of the hazardous substances and other constituents it disposed of and released at, on and from the Property." (Compl. ¶ 131). Plaintiff notes in the complaint that the Letter Agreement requires "Corning," defined in the complaint as all defendants, to "effect all remedial measures required by law or regulation." (Id. ¶ 130 (quoting Letter Agreement (DE 181 at 381)). However, the Letter Agreement is executed only by Corning Glass Works (predecessor to defendant Corning),[14] and it states that "Corning agrees to effect all remedial measures required by law." (DE 181 at 381). In turn, "Corning" is given the definition provided in the Purchase Agreement, specifically Corning Glass Works (again, predecessor to defendant Corning). (Id. at 380; Purchase Agreement, Recitals and § 1.19 (DE 181 at 318 and 320)). Thus, the Letter Agreement does not provide a basis for breach of contract liability against the secondary defendants.

Second, plaintiff asserts that "Corning," defined in the complaint as all defendants, agreed to "indemnify and hold AVX, its directors, officers, employees and affiliates harmless from and against 'any and all claims, liabilities, losses, damages, costs and expenses, including reasonable counsel fees'" arising out of, or relating to environmental contamination at the Property, under § 12.1 of the Purchase Agreement (Compl. ¶ 129 (quoting Purchase Agreement § 12.1)). Relatedly, plaintiff notes that the Letter Agreement confirmed that plaintiff "shall be entitled to indemnification" under § 12.1 of the Purchase Agreement. Again, however, the Letter Agreement

---

[14]    It is not an issue in dispute that defendant Corning is responsible under the Purchase Agreement and CERCLA as a successor to Corning Glass Works. See United States v. Carolina Transformer Co., 978 F.2d 832, 837 (4th Cir. 1992).

does not apply to the secondary defendants, and § 12.1 of the Purchase Agreement also refers in this part to "Corning," defined as Corning Glass Works (predecessor to defendant Corning). (Purchase Agreement §§ 1.19, 12.1). Thus, the express indemnity provisions in § 12.1 of the Purchase Agreement and the Letter Agreement do not provide any relief against the secondary defendants.

Finally, plaintiff relies upon § 3.3 of the Purchase Agreement. This section states, in pertinent part, that "[t]he Corning Parties" (including the secondary defendants) "shall retain, and shall be responsible for paying and satisfying . . . . all liabilities for violations of environmental laws" applicable to the operations at the Property. (Purchase Agreement § 3.3). This section is insufficient to impose breach of contract liability on the secondary defendants because it is undisputed that the secondary defendants did not own the Property, operate the Property, or arrange for disposal of any hazardous substances at the property. (Pl's Resp. Stmt. of Facts (DE 232) ¶¶ 2-6). Their involvement in the Purchase Agreement extended to other assets sold as part of the Purchase Agreement. (See, e.g., Purchase Agreement, Recitals and §§ 1.9, 1.20, 1.41, 2.1, 2.2, 2.3, and 2.4). Therefore, the secondary defendants did not have, and could not "retain," any liabilities and obligations "for violations of environmental laws" applicable to the operations at the Property. (Purchase Agreement § 3.3 (DE 181 at 332-333)).

Plaintiff argues that environmental contamination from the dry well, as well as any other environmental contamination at the Property caused by defendant Corning, was a "Retained Liability" that the secondary defendants are responsible for paying and satisfying, under § 3.3(d), because the secondary defendants' Rule 30(b)(6) witness admitted this was so. This argument is unavailing because testimony by the secondary defendants' Rule 30(b)(6) witness is parol evidence that the court must not consider in interpreting the Purchase Agreement unless the Purchase

Agreement is ambiguous on the issue presented. See <u>Schron</u>, 986 N.E.2d at 433. Here, the Purchase

Agreement is not ambiguous because the meaning of the terms in § 3.3(d) can be ascertained from

the plain language of the Purchase Agreement.

In any event, testimony by the secondary defendants' Rule 30(b)(6) witness is not probative

of the issue presented here. The testimony upon which plaintiff relies is as follows:

> Q And then if we go to the next page, subparagraph D, it says in part, 'All liabilities
> for violations of environmental laws and health and safety laws applicable to such
> operation, which violations existed or are based upon conditions that existed, prior
> to the closing date, and to the extent such violations are not attributable to or
> otherwise adversely affected by either of the purchasers' actions.'· Do you see that?
>
> A Yes. . . .
>
> Q Okay. So under this agreement, that is a Retained Liability for which all of the
> Corning entities that signed this agreement are responsible?
>
> A Correct. And the last part of that also applies to AVX -- of subparagraph D --
> and/or Vishay, but AVX.
>
> Q And one of the Retained Liabilities under this agreement was the situation
> involving the injection well at the Raleigh property; is that right?
>
> A That is correct.
>
> Q And it also involved all other contamination that Corning caused at the Corning
> -- I mean excuse me -- at the Raleigh property; is that right?
>
> A If there was any other contamination attributable to Corning at the site, this
> subparagraph would apply to that as well.

(Kane Dep. (DE 235) at 8-9).[15]  This testimony does not address the issue presented by the instant

motion, namely whether the secondary defendants are obligated for paying and satisfying liabilities

under § 3.3 where the secondary defendants did not have any pre-existing liabilities for

---

[15]     Plaintiff provides an excerpt of the deposition testimony that does not include the question preceding
the first word ("And") of the quoted language above.

environmental contamination at the Property, and where it is undisputed that the secondary defendants did not own, operate, or arrange for disposal of any hazardous waste at, the Property. Rather, the testimony, at most, confirms that any pre-existing "liabilities for violations of environmental laws and health and safety laws applicable to such operation [at the Property]" are "Retained Liabilities" under § 3.3.

Plaintiff also suggests that, even if the secondary defendants do not themselves have any liabilities due to environmental contamination at the Property, they assumed liabilities of defendant Corning, under § 3.3 of the Purchase Agreement, or otherwise agreed to indemnify plaintiff for any damages, including plaintiff's attorney's fees, arising from environmental contamination at the Property.

Neither the law nor the plain language of § 3.3 supports this theory of relief. Under New York law, "[w]hen a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." Hooper Assocs., Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 905 (N.Y. 1989). In addition, "[i]nasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise." Id. (emphasis added). "Thus, under New York law, absent 'unmistakably clear' language in an indemnification provision that demonstrates that the parties intended the clause to cover first-party claims, an agreement between two parties 'to indemnify' each other does not mean that one party's failure to perform gives rise to a claim for indemnification." Lehman XS Tr., Series

2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc., 916 F.3d 116, 125–26 (2d Cir. 2019) (citations omitted). "Unless the indemnification clause refers exclusively or unequivocally to claims between the indemnitor and indemnitee, the court must find the agreement to be lacking evidence of the required intent to cover such claims." Id. (quotations omitted).

In this case, while plaintiff purports to be able to recover for its own attorney's fees and claims directly against the secondary defendants, § 3.3 does not refer exclusively or unequivocally with unmistakably clear language to claims between plaintiff and the secondary defendants. Indeed, it does not refer at all to attorney's fees or claims brought by plaintiff against defendants, including the secondary defendants. Rather, it states that defendants, including the secondary defendants, "shall retain, and shall be responsible for paying and satisfying the following liabilities and obligations. . . ." including liabilities for violations of environmental law. (Purchase Agreement § 3.3 (DE 181 at 332-333)). Without specific reference to coverage of "first-party claims" between the parties, Lehman XS, 916 F.3d at 125, or plaintiff's attorney's fees, the language of § 3.3 does not support a claim for breach of contract against the secondary defendants.

By contrast, the express indemnification provisions in the Purchase Agreement and Letter Agreement suggest that the parties intended for indemnification of plaintiff's damages arising from defendant Corning's environmental contamination at the Property, including plaintiff's attorney's fees, to be provided, if at all, by defendant Corning. The indemnification provision in the Purchase Agreement expressly states that defendant Corning "will indemnify" plaintiff "against any . . . damages, costs and expenses, including reasonable counsel fees" arising out of environmental contamination meeting criteria described in the "Retained Liabilities" section of the Purchase Agreement. (Purchase Agreement § 12.1 (DE 181 at 360)). The Letter Agreement further

"confirm[s] and amplif[ies] the respective rights and obligations of <u>Corning</u> [defined to comprise only defendant Corning] and AVX" under the Purchase Agreement with respect to environmental contamination then identified at the Property. (Letter Agreement (DE 181 at 380)). It reiterates that plaintiff "shall be entitled to indemnification" from defendant Corning, including for "all Damages," as pertinent here, "resulting from action taken pursuant to" defendant Corning's obligation "to effect all remedial measures required by law." (<u>Id.</u> at 380-381).

The court's interpretation of the Purchase Agreement and Letter Agreement is further supported by the context in which they arose. At time of Purchase Agreement, on September 5, 1987, the parties did not describe specific environmental contamination at the Property. By contrast, at the time of letter agreement, on November 10, 1987, the parties did describe specific environmental contamination at the Property in the vicinity of the dry well, and at that time they reinforced indemnity obligations only as to defendant Corning <u>for such contamination</u>, but not for the secondary defendants. (Letter Agreement (DE 181 at 380-381)). This context further emphasizes that there is no "unmistakably clear" language in § 3.3 of the Purchase Agreement allowing plaintiff to recover its own damages and attorney's fees from the secondary defendants arising out of environmental contamination at the Property.

In sum, plaintiff has not demonstrated a genuine issue of fact as to breach of contract by the secondary defendants. Therefore, this claim against the secondary defendants must be dismissed as a matter of law. Where all claims against the secondary defendants must be dismissed as a matter

of law,[16] secondary defendants' motion for summary judgment is granted, and that part of plaintiff's motion for summary judgment on its claims pertaining to the secondary defendants is denied.

       3.     Remaining CERCLA Claims and Counterclaims

       Plaintiff brings CERCLA claims against defendant Corning,[17] and defendant Corning brings CERCLA counterclaims against plaintiff, under the cost-recovery provisions 42 U.S.C. § 9607(a), and under the contribution provisions of § 9613(f), which are subject to plaintiff's instant motions for summary judgment. The court addresses these claims in turn.

       a.     Section 9607(a)

       Section 9607(a), which defines the scope of liability under CERCLA, provides that in connection with a "facility"[18] "from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance," four classes of persons are liable for the response costs, two of which are relevant here:

(1) the owner and operator of a vessel or a facility, [and]

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.

42 U.S.C. § 9607(a)(1), (2); see Crofton Ventures Ltd. P'ship v. G & H P'ship, 258 F.3d 292, 297 (4th Cir. 2001).

---

[16]      Where the court has already determined that plaintiff's twelfth and thirteenth claims fail as a matter of law as to all defendants, the court does not reach the alternative arguments raised by the secondary defendants in support of dismissal of these claims against them.

[17]      For ease of reference, where the court has dismissed the secondary defendants in accordance with their motion for summary judgment, the court refers henceforth in the analysis in this order to defendant Corning in the singular, when referencing claims, counterclaims, motions, and arguments, which may previously have been advanced against or made on behalf of all defendants in the plural.

[18]      CERCLA defines "facility" to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).

In this manner, CERCLA "imposes broad and strict liability for the costs of cleaning up hazardous waste sites without regard to whether the persons assigned liability under the Act placed the waste material on the site or had knowledge of the waste materials' presence." Crofton Ventures, 258 F.3d at 296. "Section 9607(a)(1) renders current owners and operators strictly liable for response costs regardless of their culpability." PCS Nitrogen Inc., 714 F.3d at 185. In short, "CERCLA § 9607 is a strict liability statute." United States v. Atl. Research Corp., 551 U.S. 128, 136 (2007) (quotations omitted).

Thus, to prove a cost recovery claim under § 9607(a), a plaintiff must establish the following elements: 1) that the defendant qualifies as a potentially responsible person ("PRP") under § 9607(a); 2) that the plaintiff incurred "necessary costs of response" to a "release" or "threatened release" of hazardous substances; and (3) that the response was "consistent with the national contingency plan." 42 U.S.C. § 9607(a); see, e.g., Consolidation Coal Co. v. Georgia Power Co., 781 F.3d 129, 143 (4th Cir. 2015) ("If PRP status is established, a party faces liability under CERCLA for . . . 'necessary costs of response incurred by any other person consistent with the national contingency plan.'") (quoting 42 U.S.C. § 9607(a)).

42 U.S.C. § 9607(a) "permits recovery of cleanup costs but does not create a right to contribution." Atl. Research Corp., 551 U.S. at 139. The right of contribution, by contrast, also known as "the equitable apportionment of costs among the liable parties, including the PRP that filed the § [9607](a) action" is addressed through a claim or counterclaim under CERCLA § 9613(f). Id.

At the outset, plaintiff moves for summary judgment on defendant Corning's counterclaim under § 9607(a), on the basis that "there is no evidence that [plaintiff] used or released TCE at the

Property." (Pl's Mem. (DE 179) at 13). Plaintiff argues that "to recover from [plaintiff] under CERCLA, [defendant] must prove that [plaintiff] used and released TCE." (Id. at 13). With respect to defendant Corning's counterclaim under § 9607(a), however, this argument is incorrect as a matter of law. As a current owner of the Property, plaintiff is liable under § 9607(a) regardless of whether it used and released TCE at the Property. PCS Nitrogen Inc., 714 F.3d at 185. In the same manner, as a prior owner of the Property at the time of a disposal of a hazardous substance, defendant is liable to plaintiff under § 9607(a) regardless of whether plaintiff also used and released TCE at the Property. Crofton Ventures, 258 F.3d at 296. Plaintiff's argument regarding use and release of TCE at the Property figures much more prominently in the claim and counterclaim for contribution under § 9613(f), which the court will address in the next section of this order.

Plaintiff next asserts that it is entitled to summary judgment on its own § 9607(a) claim against defendant because it "has incurred response costs" that were "necessary and consistent with the National Contingency Plan." (Pl's Mem. (DE 205) at 17). Significant disputed issues of fact, however, remain with respect to whether and to what extent plaintiff has incurred qualifying response costs. Qualifying response costs under § 9607(a) are "costs incurred in responding to the release of a hazardous substance at the facility." Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 841 (4th Cir. 1992). Such costs are "recoverable only if they are 'necessary' and 'consistent with the national contingency plan.'" 42 U.S.C. § 9607(a)(4)(B).

CERCLA provides that "response" or "respond" "means remove, removal, remedy, and remedial action" and that "all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25). CERCLA directs the establishment of the "national contingency plan," or "NCP," as a "national hazardous substance

response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants," to be implemented through administrative regulations. 42 U.S.C. § 9605(a). The EPA has "promulgated the national contingency plan as a regulation pursuant to [§ 9605], codified at 40 C.F.R. pt. 300 (1993)." Key Tronic Corp. v. United States, 511 U.S. 809, 813 (1994). The EPA added to the "Code of Federal Regulations to clarify what 'consistent with the NCP' means for the purpose of cost collection under 42 U.S.C. § 9607." Richland-Lexington Airport Dist. v. Atlas Properties, Inc., 901 F.2d 1206, 1208 (4th Cir. 1990).

Under these regulations, "[a] private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i) (emphasis added). The regulations require reference to standards for "removal site evaluation[s]," "removal actions," "selection of remedy," and "operation and maintenance," as well as "substantially equivalent state and local requirements" regarding "public comment concerning the selection of the response action." 42 C.F.R. § 300.700(c)(5), (6). This court has observed previously that this inquiry necessarily is extremely fact-intensive, which "renders it unsuitable for summary judgment." Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp., 748 F. Supp. 373, 387 (E.D.N.C. 1990).

With respect to the type of costs that qualify as "response costs," "work that is closely tied to the actual cleanup may constitute a necessary cost of response." Key Tronic Corp. v. United States, 511 U.S. 809, 820 (1994). "[W]ork performed in identifying other PRP's falls in this category." Id. By contrast, "work . . . primarily protecting [a PRP's] interests as a defendant in the proceedings that established the extent of its liability . . . do not constitute 'necessary costs of

response' and are not recoverable under CERCLA." Id. at 820-21. Thus, CERCLA generally "does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action." Id. at 819.

In this case, multiple disputed issues of fact preclude an award of summary judgment in favor of plaintiff on the issue of whether and to what extent it has incurred response costs consistent with the NCP. These same issues preclude summary judgment in favor of plaintiff on defendant Corning's counterclaim under § 9607, regarding defendant Corning's response costs.[19] Such issues include, but are not limited to:

1)    Whether plaintiff exacerbated environmental contamination or response costs in allowing the plant to deteriorate and in the process of demolishing the former plant and underlying slab. (See, e.g., DE 198 at 234, 247, 291; DE 199 at 263; DE 206 at 73; DE 238 at 152).

2)    Whether plaintiff's process for demolition was contrary to the advice of state and federal environmental regulators. (See, e.g., DE 198 at 234).

3)    Whether plaintiff should have itself entered into the REC program as the sole Property owner to evaluate and remedy any TCE contamination (and any other environmental contamination) present in and under the plant building footprint, regardless of whether it was responsible in the first instance for placing TCE (or any other contaminant) into the environment. (See, e.g., DE 206 at 84-96).

4)    Whether and to what extent counsel and consultant fees were incurred for purposes of remedying environmental contamination versus an effort to allocate responsibility and identify factors for contribution between the parties (Compare, e.g., Arcadis Invoices (DE

---

[19]    Notably, defendant does not seek summary judgment on plaintiff's CERCLA claim and it does not seek summary judgment on its own CERCLA counterclaim.

39

251 at 86-100) ("Litigation Consulting") and (DE 251 at 172) ("Demo Support"); with id.

(DE 251 at 101-105) ("Field Activities")).[20]

5)      Whether plaintiff's response activities, if any, otherwise complicated, extended, ameliorated, or improved upon, defendant Corning's own response costs.

When inferences are drawn in the light most favorable to defendant Corning with respect to these fact-intensive issues, summary judgment in favor of plaintiff on the issue of whether it has incurred qualifying "response costs" under § 9607(a) is precluded.[21]

Therefore, the court DENIES plaintiff's motion for summary judgment as to its § 9607(a) cost-recovery claim and as to defendant Corning's § 9607(a) counterclaim.

        b.      Section 9613(f)

Section 9613(f) grants any person liable under § 9607(a) a right to "seek contribution from any other person who is liable or potentially liable" under § 9607(a).  42 U.S.C. § 9613(f)(1).  "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  Id.  "This plain language grants a court significant discretion to choose which factors to consider in determining equitable allocation of liability."  PCS Nitrogen, 714 F.3d at 186.

---

[20]      Defendant Corning moves to strike portions of statement of facts and exhibits accompanying plaintiff's reply memorandum in support of its motion for summary judgment (DE 258).  Because the court has considered such exhibits, but they do not alter the court's analysis herein, the court DENIES AS MOOT the motion to strike.

[21]      The court notes that plaintiff itself concedes that "damages issue[s] [should] be resolved as to how much AVX is entitled to recover for its response costs, either through a damages hearing after [the] liability determination is made in favor of AVX, or at a trial on the damages issue."  (Pl's Reply (DE 249) at 6) (emphasis added).  Given that "how much" response costs are recoverable is closely tied to what response costs are "necessary" and "consistent with the national contingency plan" § 9607(a), the "damages issue[s]" suggested by plaintiff constitute a substantial portion of factual issues outstanding regarding the claims under § 9607(a).

"Contribution is defined as the 'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.'" Atl. Research Corp., 551 U.S. at 138 (quoting Black's Law Dictionary 353 (8th ed.2004)). A claim or counterclaim under § 9613(f) "necessitate[s] the equitable apportionment of costs among the liable parties, including the PRP that filed the § [9607](a) action." Id. at 140.

A "court's ultimate allocation of liability reasonably [may] weigh[] relevant factors," including, but not limited to:

> [1] the degree of involvement each party had in disposals (both primary and secondary) on the site, [2] the degree of care each party exhibited with respect to hazardous substances, [3] the degree to which each party cooperated with government officials with respect to hazardous substances, and [4] the benefit each party reaped from disposals of hazardous substances on the site.

PCS Nitrogen, 714 F.3d at 186. Although the Fourth Circuit has not expressly enumerated the full range of potential equitable factors that can be considered by the district court in equitably allocating contribution between responsible parties, other additional factors that have been identified by courts include:

1) The amount of the hazardous waste involved and its degree of toxicity.

2) The financial resources of the parties involved.

3) The benefits received by the parties from contaminating activities and the knowledge and/or acquiescence of the parties in the contaminating activities.

4) The extent of the current owner's knowledge of contamination at the property at the time of purchase and that the property may appreciate following its remediation.

See, e.g., Minyard Enterprises, Inc. v. Se. Chem. & Solvent Co., 184 F.3d 373, 387 (4th Cir. 1999)

Envtl. Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 508 (7th Cir. 1992) (collecting cases);

United States v. Colorado & E. R. Co., 50 F.3d 1530, 1536 (10th Cir. 1995). "[T]he court has

considerable discretion as to what and how many equitable factors it will consider in allocating

Response Costs among the responsible parties." Minyard, 184 F.3d at 385. "A court may consider

several factors, a few factors, or only one determining factor, depending on the totality of the

circumstances presented to the court." Colorado & E. R. Co., 50 F.3d at 1536 (quoting Envtl.

Transp. Sys., 969 F.2d at 508).

Here, plaintiff seeks summary judgment on its contribution claim and on defendant

Corning's contribution counterclaim primarily on the basis that there is no evidence that plaintiff

"used or released TCE at the Property." (Pl's Mem. (DE 179) at 15; Pl's Mem. (DE 203) at 18).

At the outset, the court rejects plaintiff's suggestion that this issue of use or release of TCE at the

Property is determinative of plaintiff's contribution claim and defendant Corning's contribution

claim. Under the totality of the circumstances of this case, involving years of ownership and

involvement by both parties in operations and cleanup at the Property, as well as interactions

between the parties and governmental agencies with respect to operations at the Property, the

determination of contribution rests upon multiple factors beyond plaintiff's use or release of TCE

at the Property.

Nevertheless, the court recognizes the significance of the issue of whether plaintiff used or

released TCE at the Property, as it is an issue that is subject to detailed and substantial briefing by

the parties. The court thus addresses next whether there is any genuine issue of material fact on this

important issue in the case. The court addresses further below additional factors bearing upon contribution.

i. Whether Plaintiff Used or Released TCE at the Property

Plaintiff has demonstrated there is no genuine issue of material fact on the issue of whether plaintiff used or released TCE at the Property. It is significant to this determination that no witness has testified in deposition to using, spilling, releasing, or disposing TCE at the Property at any time during plaintiff's ownership of the Property. No witness testified in deposition even to observing TCE present at the property, entering the property, or leaving the property, during that time.

Martha Girolami, who worked at the Property for defendant from 1984 to 1987 as a process engineer, and for plaintiff from 1987 to 2007 in an environmental management capacity, testified that plaintiff's manufacturing processes were "all aqueous systems," and she "never had to deal with TCE." (Girolami Dep. 32-33). When asked, "If [plaintiff] had TCE at the plant, . . . who would have dealt with it?", Girolami responded, "I would have been the one." (Id. 53). She further testified plaintiff "had no TCE in the factory during my time." (Id. 80). In addition, she testified that "chlorinated hydrocarbons were always banned" by plaintiff, and that TCE is an example of a chlorinated hydrocarbon. (Id. 102). Further, Girolami testified that plaintiff used flammable solvents, such as "alcohol, acetone, xylene, toluene," and one chlorinated solvent, "Hysol." (Id. 67, 79, 84, 106). Plaintiff also used "flammable liquid" to clean in the maintenance shop. (Id. 60).

David Ballenger, who worked at the property for defendant from 1976 to 1987 as a product development engineer, and for plaintiff from 1987 to 2005 as an engineering plant manager, testified that he had used TCE in other past positions with different companies, but he did not use TCE at the Property. (Ballenger Dep. 8-9, 13-14). He testified that he did not observe, and was not aware of,

43

use of TCE at the Property.  (Id. 15-17).  According to Ballenger, in comparison to another location

where he had worked before that used "stainless-steel belts and TCE was used to clean them," the

process at the Property used "paper belts that were disposable," and a "water-based system which

is directly related . . . to environmental" considerations.  (Id. 16).  Ballenger testified that he did not

"know of any chlorinated solvents being used" while he was at the Property either by plaintiff or

defendant. (Id. 54).

David Himberger, who worked at the Property for defendant from 1973 to 1987, and for

plaintiff from 1987 to 2013, including as plant manager, was not aware of use or disposal of TCE

at the Property, and he never heard about it being used at the Property.  (Himberger Dep. 107;

Himberger Decl. ¶¶ 4, 7).  Jennifer Snyder, environmental engineer at the Property from 1994 to

1996 testified that she had no knowledge of use of TCE at the Property and TCE never came up in

discussions with anybody at the Property.  (Snyder Dep. 16, 30).

Ronald Tidwell, who worked at the Property for defendant from 1983 to 1987, and for

plaintiff from 1987 to 1993, including as an environmental health and safety technician, testified that

he had no knowledge of TCE being used at the Property by either plaintiff or defendant. (Tidwell

Dep. 11, 27, 37).  Similarly, Richard Gould, plant manager at the Property from 1997 to 2000

testified that AVX mandated elimination of use of TCE in the mid 1980s, and he was not aware of

plaintiff's use of TCE in its operations at the Property.  (Gould Dep. 26). John Lawing, process

engineer from 1972 to 1980 and general manager during the 1990s at the Property, testified that

"TCE was not a material accepted for use."  (Lawing Dep. 23, 29).

Dennis Odland, who was a corporate safety manager and environmental manager for

plaintiff, who audited the plant at the Property on numerous occasions between 1987 to 2013,

testified that he "never found" TCE at the plant. (Odland Dep. 14). He testified that plaintiff "didn't use it during the time" that plaintiff had the plant, because the plant "had figured out a way to accomplish the same work using other materials [than TCE] before [plaintiff] acquired" the Property. (Id. at 20-21). Similarly, Larry Blue, who was an environmental engineer for plaintiff, who audited the plant at the Property during 10-20 inspections, testified that he never observed TCE being used at the Property. (Blue Dep. 14).

Notably, defendant Corning does not offer testimony of any other individuals who worked at the Property, either during defendant Corning's ownership or plaintiff's ownership, who personally observed use of TCE at the Property. In contrast to this testimony, it is undisputed that defendant Corning used TCE at the Property during the period of its ownership. (Defs' Resp. Stmt. (DE 195) ¶ 2). It is not refuted "that TCE had been used in a small vapor degreaser operation from 1965 to 1972" in the plant, on the "resistor line." (Ford Memo, dated Nov. 5, 1987 (DE 182 at 233)). Thus, for seven years, corresponding to a time prior to any regulation of the use and disposal of TCE under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., ("RCRA"), or CERCLA, defendant Corning used TCE in the plant. Coupled with this fact, it is not refuted that defendant used during its ownership of the Property "[a]n injection well (concrete sump) tied to floor drains in virgin solvent storage shed." (Pollution Incident Reporting Form (DE 181 at 452).

It is also significant to the court's analysis of the issue of plaintiff's TCE releases that state environmental and waste inspection reports do not mention any releases, disposals, receipts, or use of TCE by plaintiff at the Property. Notably, chemical inspection reports completed by the State of North Carolina at the plant at the Property between 1987 to 2007 do not mention TCE, even though checklists in the reports expressly provide a prompt and opportunity to note generation of TCE at

the plant. (See, e.g., Chemical Inspection Reports (DE 182 at 111, 114, 125, 128 )). In some reports "n/a," or similar negative notation, is noted in handwriting next to the prompts referencing TCE. (Id. (DE 182 at 125, 128)). In others, space for description is populated by descriptions of other chemicals in a category, but not TCE. (Id. (DE 182 at 130, 135 (noting "Waste Freon (SMT) - F001" and "Waste 1,1,1-trichloroethane - F002"), 139 (F002 - "1,1,1-Trichloroethane"), 145, 154, 167 (F002 - "Methylene chloride"), 171, 184, 193 ("F002, F003 . . . acetone, ethyl ether")). In sum, the only plausible inference from all this evidence is that defendant Corning used and released TCE at the Property and plaintiff did not use or release TCE at the Property.

Defendant raises several arguments in an effort to establish a genuine issue of material fact as to whether plaintiff used or released TCE at the Property. None of these arguments, addressed in turn below, are availing.

A)   Documentary Evidence and Testimony

In support of its contention that plaintiff used or released TCE, defendant points to the existence in plaintiff's plant records of the following MSDSs referencing products that contain a percentage of TCE:

1)   A 1996 MSDS for "Accelerator 4," an adhesive, that contains, in part, 15 % TCE and 70 % Methylene chloride (DE 182 at 252);

2)   A 2002 MSDS for "WELD-ON 3," also referenced as "dichloromethane," that contains 9 % TCE and 90 % Methylene chloride (DE 182 at 258);

3)   A 1993 MSDS for "Lens Clens #1," that contains less than 1% TCE, along with less than 1% chloroform, less than 5% Ammonium Hydroxide, 48.5 % Isopropyl Alcohol, and 48.5% water. (DE 182 at 260; DE 196 at 337).

This evidence is insufficient to create a genuine issue of material fact, however, because no witness testified to using any of these products. Indeed Odland testified that plaintiff instructed plants that "even if they got a material in from a vendor, requested or unrequested, or an engineering sample, that they keep the MSDS for that material." (Odland Dep. 24). Defendant points to testimony that if plaintiff had a MSDS for a particular product "it had at least been used at some point," (Snyder Dep. 24), and that Girolami received a fax forwarding "MSDS information for the lens cleaner solutions you use." (DE 196 at 346). But this evidence is insufficient to permit an inference that any particular amount of these products were used or that they were used with any frequency. Moreover, even if some use of these products can be inferred, there is no evidence of any spills or release associated with these products.

In particular, with respect to the Accelerator and WELD-ON products, which contained four to ten times more methylene chloride, there is no basis to infer a release by plaintiff of these products into, under, or around the Property, where methylene chloride has not been detected in any significant quantities in numerous testing locations found to contain significant quantities of TCE. (See, e.g., Arcadis Investigation Maps (DE 182 at 272; DE 198 at 365)).

With respect to the "Lens Clens #1" product referenced in the MSDS faxed to Girolami (DE 196 at 337), a 1993 hazardous material inventory form from the plant states that it is one of four items listed as "optical cleaner" supplied by Cascade Laser, the "Typical Amount On-Hand" is "3-6 oz," and the "Specific Area(s) Used" is "Smp Package/Laser." (DE 196 at 355). This does not suggest use of "Lens Clens #1" in any plant processes, but rather only as one in a sample set. Moreover, MSDSs for two other "Lens Clens" products supplied by Cascade Laser do not list TCE as contents. (DE 196 at 340-345). In any event, where the "Lens Clens #1" product only contains

less than 1 % TCE, and the amount of the container is "3-6 oz," it is speculative to infer from this fractional amount that plaintiff released TCE at the Property, absent any evidence regarding frequency and amount of use at the Property.

Defendant argues that certain testimony by former employees that they did not know whether TCE was used, or did not know about use and processes in specific plant departments, shows that plaintiff used TCE at the Property. For example defendant points to testimony by Himberger that "to the extent that the trade/machine shops was using Weld-On," he would not have known about it. (Himberger Dep. 73). Ballenger testified that until the 2000s he did not oversee the "maintenance department," and that chemicals used in the maintenance department were not "as tightly controlled as Process was." (Ballenger Dep. 24). Girolami did not know, or could not remember, all the chemicals that were used in the quality control labs or in the maintenance department. (See Girolami Dep. 60). Odland testified that corporate policy applicable to all plaintiff's facilities banned TCE in production processes, but "[t]here were some products that had a small amount of TCE in them that were not used in manufacturing, and that might include cutting oil or glues." (Odland Dep. 89).

But these witness's lack of knowledge about use of TCE at the Property is insufficient to create a triable issue of fact. In light of testimony set forth above that plaintiff did not use TCE at the Property, the burden rests with defendant to bring forward evidence demonstrating a genuine issue of fact that plaintiff used or released TCE at the Property. See Matsushita, 475 U.S. at 586-87. The absence of testimony regarding use of TCE by plaintiff, in the maintenance department or

otherwise, does not meet this burden.[22] "[I]t is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture," as here. Lovelace, 681 F.2d at 241.

In sum, the cited documentary evidence and testimony does not create a genuine issue of material fact that plaintiff used or released TCE at the Property.

B)  Groundwater sampling

Defendant Corning asserts that current "groundwater sampling data showing TCE emanating from the former . . . manufacturing plant" demonstrates plaintiff caused TCE releases because "this contamination was not present when [defendant Corning] sold the Property to [plaintiff]."  (Mem. in Opp. (DE 194) at 25).  This assertion is insufficient to demonstrate a genuine issue of material fact as to plaintiff's releases of TCE for several reasons. As an initial matter, while it is undisputed that recent groundwater testing shows significant TCE contamination in groundwater beneath the footprint of the former plant, it is speculative based upon the evidence to say TCE groundwater contamination was not present in 1987, where there was no groundwater testing conducted beneath the footprint of the former plant at that time.  (See Ford, Nov. 5, 1987 Memo, (DE 182 at 229-245; Nixon, Hargrave, Devans & Doyle, Report of Pre-acquisition Audit (DE 182 at 283)).

_____

[22]    The parties dispute the significance of a "1987 Hazardous Waste Generator Only Annual . . . Report" that states that 8 pounds of TCE were shipped offsite for disposal in 1987 as part of a "lab pack." (DE 182 at 203). Plaintiff asserts that this report clearly shows TCE was shipped offsite by defendant Corning directly before the sale of the Property to plaintiff, and that this coincides with hazardous waste disposal documented by Ford as part of pre-closing preparation of the Property.  (Ford Memo, dated Nov. 5, 1987 (DE 182 at 243)).  Defendant Corning asserts that it is unclear whether defendant Corning or plaintiff shipped the TCE offsite in 1987, noting the report was prepared by plaintiff.  (Def's Stmt. of Facts (DE 195 at 49).  In either case, the report is the latest reference to TCE being transported to or from the Property, coinciding with the year the Property was sold.  The report does not suggest use of TCE by plaintiff at the Property, but rather suggests, at most, that defendant Corning maintained a stock of pure TCE at the Property prior to its sale to plaintiff.

Defendant Corning points to "soil gas sampling" conducted by plaintiff's environmental consultant, Ford, prior to closing on the Property in 1987, showing only low levels of soil contamination (two parts per billion) detected south of the plant and no significant levels of soil contamination detected anywhere other than around the dry well. (Id. at 9-10). But this sampling is described as a "soil vapor survey" that measured levels of chemical compounds in the soil near the soil surface, with the exception of samples taken from the bottom of the excavated dry well. (Ford, Memo., Nov. 5, 1987 (DE 182 at 229, 231)). "Sampling was conducted by advancing a small diameter probe 2 to 3 ft. below the ground surface and creating a slight vacuum in the hollow probe to obtain a small volume of soil vapor." (H&A, Report on Soil Vapor Investigation, Dec. 7, 1987 (DE 196 at 7)). "[O]ther than [this] soil gas survey limited to areas having some indications of contamination, no soil or water testing was conducted." (Nixon, Hargrave, Devans & Doyle, Report of Pre-acquisition Audit (DE 182 at 283)). According to the soil sampling investigation report, "soil vapor sampling results cannot be directly correlated to analytical results obtained in a laboratory for specific soil or groundwater samples." (DE 196 at 8).

In addition, groundwater monitoring wells constructed shortly after the purchase of the property, in January, 1989, particularly a well identified at the time as "MW-1," which was upgradient of the dry well and the chemical storage building, at a depth of 18.49 feet, showed elevated levels of TCE. (Law Environmental Report, March 2, 1989 (DE 181 at 36, 41, 46, 56); see Order Appendix 4; see also Ford, Memo, Sept. 27, 1989 (DE 181 at 445, 449)). Following these results, in a report of a meeting in part between plaintiff's consultant and defendant Corning, Ford noted that she was "very uncomfortable with the LAW conclusion that only there was one source (i.e., the former injection/dry well)," but that defendant Corning "stated emphatically that it was the

position of Corning that there was 'insufficient evidence' of a second significant source." (Ford, Memo, Feb. 2, 1990 (DE 181 at 465)). As noted above, no groundwater testing was done at that time under the plant footprint, nor for years thereafter when the focus was on groundwater testing around and downgradient of the drywell. (Nixon, Hargrave, report of pre-acquisition audit (DE 182 at 283); see, e.g., Law Environmental, Inc., Report of Additional Ground-Water Assessment, June 14, 1991 (DE 196 at 138-147)).

Finally, although the soil vapor survey in 1987 revealed only minimal TCE in soil vapor upgradient of the dry well, other soil vapor TCE readings downgradient of the dry well also were minimal, in areas where significant groundwater contamination soon thereafter was detected. (Compare, e.g., H&A, Report on Soil Vapor Investigation, Dec. 7, 1987 (DE 196 at 10) (results for CR-2 (three parts per billion), CR-18 (four parts per billion), CR-22 (10 parts per billion)) with Law Environmental Report, April 30, 1991 (DE 196 at 180-181) (results for groundwater monitoring wells MW-2 (1,200 parts per billion), MW-6A (1,200 parts per billion), and MW-6B (12,000 parts per billion); Law Environmental, September 1991 Report (DE 196 at 188) (RW-1 at greater than 1,000 parts per billion); see also Hutto & Royer, Supp. Expert Report, Nov. 2, 2018 (DE 209 at 283) (same, with additional result for groundwater well RW-1 (26,000 parts per billion)). Thus, the very presence of even minimal TCE in the soil vapor in 1987 is consistent with significant amounts of TCE present in the groundwater underlying these same locations. (See id.).

In sum, in light of all these circumstances, coupled with the absence of testimony and documentary evidence of releases by plaintiff, recent groundwater testing evidence does not create a genuine issue of material fact that plaintiff used or released TCE at the Property.

C)  Expert CSIA Opinions

Defendant Corning relies upon expert opinions by Mancini and Duncklee for the proposition that "CSIA analysis of samples from the Property shows multiple sources of TCE that are more recent than the contamination in the dry well area and that are attributable to [plaintiff's] ownership of the Property."  (Def's Mem. in Opp. (DE 194) at 20).  For the reasons stated below, the expert opinions of Mancini and Duncklee premised upon CSIA are neither relevant nor reliable.  Therefore, these opinions must be excluded, for purposes of plaintiff's motion to exclude (DE 215).  In addition, they do not provide a basis for finding a genuine issue of material fact that plaintiff used or released TCE at the Property, for purposes of the instant motion for summary judgment.

Under Rule 702, expert testimony is appropriate when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Enid. 702. A witness qualified as an expert may be permitted to testify where "(b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." Id.

 Rule 702 imposes a "basic gatekeeping obligation" upon a trial judge to "ensure that any and all scientific testimony is not only relevant, but reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert, 509 U.S. at 592-93. "The proponent of the testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).

"[R]elevance – or what has been called 'fit' – is a precondition for the admissibility of expert testimony, in that the rules of evidence require expert opinions to assist the 'the trier of fact to

understand the evidence or to determine a fact in issue.'" United States v. Ancient Coin Collectors Guild, 899 F.3d 295, 318 (4th Cir. 2018) (quoting Daubert, 509 U.S. at 597). A key "aspect of relevancy . . . is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Daubert, 509 U.S. at 591 (internal quotations omitted).

The reliability inquiry is a "flexible one focusing on the principles and methodology employed by the expert, not on the conclusions reached." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (internal quotations omitted). In assessing whether expert testimony is "reliable," the court may consider:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the techniques' operation; and (5) whether the technique has received general acceptance within the relevant scientific or expert community.

United State v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (internal quotations omitted). These factors are "neither definitive, nor exhaustive," and "particular factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [her] testimony." Cooper, 259 F.3d at 199–200. "[T]he court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful[,] . . . depend[ing] upon the unique circumstances of the expert testimony involved." Westberry, 178 F.3d at 261.

The expert opinions of Mancini are not relevant because they would not assist the trier of fact in determining the material issue presented by the instant motion, namely whether plaintiff used or released TCE at the Property. In her expert report, Mancini states that she reviewed the report of Davidson and "adopt[s] the opinions and conclusions stated in that report." (Mancini Rep. 2 (DE

223-20 at 4)).  As so adopted, Mancini concludes "there is a minimum of one source of TCE in Former AVX Building wells, based primarily on [CSIA] analysis," and "more extensive release(s) of TCE occurred within the Former AVX Building footprint than within the Outparcel."  (Id. at 29 (DE 223-20 at 44).  These conclusions are not relevant because it is undisputed that there is a source of TCE at the footprint of the former plant on the Property, and that concentrations found at that location are greater in some instances than concentrations found in the outparcel.  (See, e.g., Philp Report at 70 (DE 223-7 at 71 (stating that "isotope ratios from monitoring wells with highest TCE concentrations were evaluated," and "[t]hese wells are located within the footprint of the main building and S/SE (downgradient) from the main building")); Pl's Reply (DE 248) at 4 ("Both Corning's and AVX's non-CSIA experts agree that TCE originated from . . . an area under the manufacturing plant and an area at the illegal injection well"); Arcadis Investigation Maps (DE 182 at 272; DE 198 at 365;  Order Appendix 6); Wood Map (DE 199 at 104; Order Appendix 7)).  These conclusions would not provide helpful information to a factfinder on the issue of what entity caused releases at the former plant on the Property and when those releases occurred.

Mancini also concludes that "TCE in the Outparcel is generally more degraded than TCE beneath the Former AVX Building."  (Mancini Rep. 29 (DE 223-20 at 44).  This opinion would not be helpful to the factfinder because a conclusion that TCE is "generally more degraded" in the Outparcel does not tend to show that plaintiff used or released TCE at the plant on the Property. Mancini confirmed that "CSIA data does not permit age dating TCE," and she did not provide an opinion on "what company released chemicals" at the Property.  (Mancini Dep. 53).  According to Mancini, "You cannot use CSIA to point to a specific manufacturer of TCE."  (Id. 56).  In sum,

Mancini's conclusions would not provide helpful information to a trier of fact on the issue of what entity caused releases at the former plant on the Property and when those releases occurred.

Portions of Duncklee's expert opinion that rely upon CSIA analysis to time TCE releases similarly are not relevant. For example, Duncklee concludes in his report that CSIA evidence shows that "TCE under the Former AVX Building is from a more recent release or releases than the TCE on the Outparcel related to the dry well source." (Duncklee Supp. Rep. at 5 (DE 223-21 at 89)). But, concluding in this manner that a "more recent release" occurred can refer to any time period between 1972 and the date of the report in 2018. As such, the conclusion that TCE under the plant footprint is from "a more recent release or releases" based upon CSIA evidence is not helpful to the trier of fact, because it does provide the date of the releases or what entity caused the releases.

Duncklee's opinion also is not relevant where it concludes that CSIA evidence supports a determination that TCE originated from "releases attributable to AVX's operations that began at the Property in November 1987." (Duncklee Supp. Rep. at 7 (DE 223-21 at 91)). This portion of Duncklee's opinion is not relevant because it is not "sufficiently tied to the facts of the case" as demonstrated by the instant record. Daubert, 509 U.S. at 591 (internal quotations omitted). In particular, as set forth above, defendant Corning has not demonstrated a genuine issue of material fact, through testimony, documentary evidence, or any other evidence, that plaintiff used or released TCE at the Property. Thus, Duncklee's opinion premised upon "releases attributable to AVX's operations that began at the Property in November 1987" is not relevant because there is no evidence of such releases.[23] In sum, Duncklee's opinions premised upon CSIA evidence are not relevant.

---

[23] Additional opinions of Duncklee that are not expressly reliant upon CSIA evidence, but are premised upon TCE releases by plaintiff, similarly are not relevant. For example, Duncklee opines that TCE extracted in 2016 from drain water in the former plant, before it was demolished, is attributable to plaintiff's operations. Duncklee states, "[b]ecause these drains were likely regularly flushed by water, it is my opinion the TCE that I observed was not

In addition, and in the alternative to a relevancy determination, Duncklee's opinions premised upon CSIA evidence are not reliable. In particular, these opinions rely upon a "biodegradation" analysis at multiple key junctures, including as follows:

1)   "[T]he TCE isotopic signature of groundwater from . . . wells in the Former AVX Building . . . is <u>not</u> significantly biodegraded."  (Duncklee Supp. Rep. 8 (DE 223-21 at 92) (emphasis in original)).

2)   "My opinions are based on the following facts . . . . [including] that the TCE detected in Source 1 Wells is less degraded than TCE detected in other wells on the Outparcel, around the dry well, and in other areas."  (Duncklee Supp. Rep. 7 (DE 223-21 at 91); <u>see also</u> <u>id.</u> at 5 (DE 223-21 at 89 (similar)).

3)   "Given that geochemical conditions that affect the degradation of TCE are similar within the Outparcel, the reduced degradation of TCE associated with Source 1 in the Outparcel compared to TCE in other Outparcel wells shows that the Source 1 TCE was released more recently."  (<u>Id.</u> at 6 (DE 223-21 at 90)).

4)   "Geochemical conditions in groundwater that affect the rate of degradation are similar across the Property (see Tables 1 and 2 and Figures 3 and 4). Given these conditions, if the TCE in different wells were released around the same time, <u>one would expect</u> the TCE in these

---

associated with Corning's operations, which had ceased nearly 30 years before, but rather, was associated with AVX's operations."  (Duncklee Decl. ¶ 7 (DE 199 at 265)).  This opinion is not relevant because there is no evidence in the record regarding regular flushing of drains in the plant, particularly at the time of testing, which was at least three years after plant operations had ceased. It is also not relevant because of the lack of evidence that plaintiff used or released TCE in its operations. Moreover, this opinion is not reliable because it does not address an obvious alternative explanation, recognized by defendant Corning's own consultant, that TCE in groundwater can "volatilize into the overlying soil and potentially migrate into overlying structures."  (Data Gap Report (DE 181 at 478); <u>see id.</u> (noting "potential for CVOC vapors to accumulate in buildings"); <u>see also</u> Law Environmental, Inc., August 15, 1989, Report (DE 204 at 446)) (examining upgradient well test results, opining that "TCE may have reached [the upgradient well] by migration of vapors in the vadose zone," and "vapors would likely be dissolved into waters infiltrating downward from the surface, as they passed through the contaminated vadose zone").

wells to have undergone <u>a similar amount of degradation</u>. TCE detected in Source 1 Wells has generally undergone a similar amount of degradation, <u>suggesting a similar age of release</u> for the TCE detected in Source 1 Wells. However, the TCE in non-Source 1 Wells has undergone significantly more degradation than the TCE in Source 1 wells, <u>suggesting the TCE in Source 1 Wells was released more recently</u> than the TCE in non-Source 1 Wells." (<u>Id.</u> (emphasis added).

Duncklee's application of this biodegredation analysis to the CSIA data under the circumstances of this case, however, is not reliable method for determining timing of TCE releases or what entity caused TCE releases. In particular, application of this biodegredation technique in the manner used by Duncklee has not been tested, has not been subjected to peer review or publication, has an extremely high potential rate of error, is not subject to any standards controlling the techniques' operation, and has not received general acceptance within the relevant scientific or expert community.

As noted above, defendant Corning's own CSIA expert, Mancini, confirmed that "CSIA data does not permit age dating TCE," and she did not provide an opinion on "what company released chemicals" at the Property. (Mancini Dep. 53, 158). According to Mancini, "You cannot use CSIA to point to a specific manufacturer of TCE." (<u>Id.</u> 56, 159). Plaintiff's CSIA expert, Philp, confirms these methodological principles. (<u>See</u> Philp Rep. 59, 75, 77 (DE 223-7 at 60, 76, 78)). With respect to biodegradation, Mancini testified:

> Q. . . . . [D]o you know if at this site TCE biodegrades uniformly throughout the site?
> A. No, I do not.
> Q. And is there a way to scientifically determine if TCE can biodegrade uniformly on a piece of property such as this?
> A. Define uniformly.
> Q. Consistently.

A. That is a very difficult task to do.

Q. Have you done it previously?

A. At other sites?

Q. Yes.

A. I have evaluated biodegradation of chlorinated compounds at other sites.

Q. And have you determined if at those other sites whether the biodegradation was uniform or consistent throughout the site?

A. <u>That is too difficult of a task to accomplish</u>.

(Mancini Dep. 57) (emphasis added). Mancini also outlined "a number of factors" that must guide the methodology of evaluating biodegradation at a site, including "[t]he redox conditions, [and] the presence of the bacteria capable of degrading." (<u>Id.</u> 58). She stated, "As a scientist, I have to consider all aspects of understanding how the different degradation mechanisms can impact the isotopic signatures." (<u>Id.</u> 89). Again, Philp confirms the necessity of accounting for such factors in methodology, noting that "significant extent of degradation observed in a given section of a contaminated site corresponds to conditions favorable for the degrading microorganisms rather than the time of residence in sediment or groundwater." (Philp Rep. 77 (DE 223-7 at 78).

In this manner, there is too great an "analytical gap" between the CSIA data in this case, which is summarized in the reports of Mancini and Duncklee, and Duncklee's ultimate opinions about dates of TCE releases and the entities that released TCE at the Property. <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997). Duncklee's report does not provide a reliable method for bridging this gap, other than his own statements that he is drawing the conclusions reached, based upon "suggest[ions]" of the age of release. (Duncklee Rep. 6 (DE 223-21 at 90). Such conclusions based upon the "ipsi dixit" of the expert are not reliable. <u>Gen. Elec. Co.</u>, 522 U.S. at 146. A critical shortcoming in the methodology used is the failure to take into account other factors and alternative explanations that are impacting the CSIA data Duncklee used to draw his conclusions, such as

58

variations in site conditions due to the former presence of the building and concrete slab over the area of present groundwater and soil contamination. (See, e.g., Mancini Dep. 57-58; Philp Rep. 77).

Likewise, Duncklee's methodology is unreliable because it reaches conclusions from biodegradation analysis without taking into account "a number of factors," as suggested by Mancini, that must guide the methodology of evaluating biodegradation at a site, including "[t]he redox conditions, [and] the presence of the bacteria capable of degrading." (Mancini Dep. 58). Further, Duncklee's biodegradation analysis is subject to an extremely high rate of error, and it has not received general acceptance in the scientific community, where Mancini notes that determining at a site "whether the biodegradation was uniform or consistent throughout the site" "is too difficult of a task to accomplish." (Mancini Dep. 57) (emphasis added). Consistent with Mancini's statement, plaintiff's experts Hutto and Royer also conclude that Duncklee's conclusions regarding consistency of site conditions are "inaccurate . . . given the variability of site conditions including the geochemical and physical conditions across the Site." (Hutto & Royer Sec. Supp. Rep. 26 (DE 220-3 at 8)).

Defendant Corning argues, nonetheless that Duncklee's conclusions regarding timing of TCE releases and identity of releasing entity, premised upon CSIA data, should be considered reliable because they are actually consistent with Dr. Mancini's deposition testimony. Defendant Corning cites Mancini's statement in deposition that "Since existing geochemical data do not permit meaningful conclusions on the dates of individual contaminant releases, CSIA data alone cannot be used as a tool for apportionment of responsibility between the site and different site operators." (Defs' Opp. (DE 239) at 34) (emphasis added by defendant Corning). Defendant Corning argues that "Mancini's testimony is completely consistent with Mr. Duncklee's opinion that CSIA data can

– when coupled with other data, information, and analysis – be used to apportion responsibility," citing Duncklee's deposition testimony. (Id.). This argument misses the mark on two fronts. First, defendant Corning fails to note that Mancini at this point in her deposition is, in fact, quoting a statement from Philp's expert report and expressing her agreement with this proposition advanced in the first place by Philp. (Compare Mancini Dep. 169 with Philp Rep. 78 (DE 223-7 at 79). As noted, above, Philp shortly prior to this statement in his report averred that "the extent of degradation of TCE cannot be used as an indication of the age of a particular release." (Philp Rep. 77 (DE 223-7 at 78) (emphasis added)). Second, while defendant Corning suggests in theory that CSIA data can be used to apportion responsibility when coupled with other appropriate data and analysis, the cited portions of Duncklee deposition do not explain how Duncklee did so in this case, and they do not repair any of the analytical gaps and shortcomings of Duncklee's expert opinions identified herein. (See Duncklee Dep. 473-474). Indeed, the cited deposition testimony does not mention biodegradation. (See id.).

In sum, due to a combination of shortcomings, defendant Corning has failed to demonstrate that Duncklee's opinions regarding timing of TCE releases and identity of releasing entity, premised upon CSIA data, are the product of reliable methodology. Therefore, plaintiff's motion to exclude expert opinions of Mancini and Duncklee premised upon CSIA, is granted on the basis of lack of relevance and reliability.[24]    As a result, where defendant Corning has failed to demonstrate a

_____

[24]    Because the court grants plaintiff's motion to exclude defendant Corning's expert opinions premised upon CSIA, on the basis of relevance and reliability, the court the court does not reach plaintiff's alternative grounds for excluding and striking the opinions, including as sanctions for defendant Corning's litigation conduct. Where plaintiff seeks broader relief, in part, as sanctions, including dismissal of all of defendant Corning's counterclaims (see, e.g., DE 215 at 1), and striking defendant Corning's rebuttal declarations (see DE 246 & DE 247 at 29-30), the court determines that good cause has not been shown for such sanctions. Therefore, plaintiff's motion, in that part where it seeks such sanctions, is DENIED. In addition, where the court excludes defendant Corning's expert opinion evidence regarding CSIA, the court excludes expert opinions and evidence and testimony of Philp from trial on the issue of whether plaintiff used or caused releases of TCE at the property, on the basis that such evidence for that purpose is not

genuine issue of material fact on the issue of whether plaintiff used or released TCE at the Property, summary judgment must be granted to plaintiff on this issue bearing on the § 9613(f) contribution allocation for the CERCLA claims and counterclaims.

ii.     Other Factors Bearing on Contribution

Genuine issues of material fact preclude summary judgment in favor of plaintiff on remaining issues bearing on the § 9613(f) contribution allocation.  The court has previously highlighted a number of these issues in conjunction with the determination of whether and to what extent plaintiff's and defendant Corning's response costs are consistent with the National Contingency Plan.  These issues are amplified here in considering the totality of circumstances bearing on contribution.

For example, it is a factor for contribution the extent to which each party had involvement in "secondary" disposals on the Property.  Owners or operators of a facility may be "liable for 'secondary disposals' – that is, the movement or dispersal of already-once-disposed hazardous substances through earth-moving or construction activities – that occur during their ownership or operation of the facility."  <u>PCS Nitrogen</u>, 714 F.3d at 177.  Here, defendant Corning has raised a genuine issue of material fact whether plaintiff exacerbated environmental contamination or response costs in allowing the plant building to deteriorate and in the process of demolishing the former plant building and underlying slab. (<u>See, e.g.,</u> DE 198 at 234, 247, 291; DE 199 at 263; DE 206 at 73).

---

relevant. Accordingly, defendant Corning's motion to exclude expert testimony of Philp from trial is GRANTED in that part on the basis of relevance.  Furthermore, where the court has not relied upon the Bonessi declaration in addressing relevance and reliability of CSIA opinions, defendant Corning's motion to strike (DE 241) said declaration is DENIED AS MOOT. Finally, where defendant Corning also seeks broader relief, in part, as sanctions against plaintiff for filing the Bonessi declaration, the court determines that good cause has not been shown for such sanctions.  Therefore, defendant Corning's motion, in that part where it seeks such sanctions, is DENIED.

The extent of cooperation by both plaintiff and defendant Corning with government officials in identifying and remediating contamination at the Property also is a factor not susceptible to summary judgment determination. Substantial questions of fact remain, when the evidence is viewed in light most favorable to defendant Corning, regarding the extent to which defendant Corning's remediation of the Outparcel has been in accordance regulatory requirements and guidance, and whether and to what extent plaintiff should be responsible for failure itself to enter into the REC Program or undertake other or different remediation strategies with respect to the remainder of the Property. (See, e.g., DE 198 at 234; DE 206 at 84-96).

Additional equitable factors applicable to the unique circumstances of this case include the nature and extent of plaintiff's knowledge and assessment of releases and potential releases at the Property, both at the time of purchase and in the years following. Similarly in dispute is the extent of defendant Corning's ability to assess and address contamination under the plant footprint during the same time period, including during the period of this litigation in which defendant Corning has taken a litigation position that plaintiff is entirely responsible for such contamination. Likewise, the court may take into consideration competing considerations regarding appreciation of the value of the property following remediation countered against challenges and costs faced by plaintiff in marketing the property for sale in its present condition. (See, e.g., DE 198 at 25, 148, 155, 165, 244; DE 199 at 209-211, 246).

In sum, with respect to factors bearing on the claim and counterclaim for contribution under § 9613(f), multiple disputed issues of fact preclude summary judgment in favor of plaintiff.

4.    Breach of Contract Counterclaim

Plaintiff seeks summary judgment on defendant Corning's counterclaim for breach of contract, which is premised upon the limitation of defendant Corning's liabilities under section 3.3(d) of the Purchase Agreement. Defendant Corning asserts in its counterclaim that any violations of environmental laws (e.g., CERCLA) arising from operations at the Property "result in whole or in part from [1] the release of hazardous substances at, on, or from the Property after [plaintiff] purchased the Property and/or [2] from actions taken by [plaintiff] that exacerbated existing conditions at the Property," and would thus be liability assumed by plaintiff under the Purchase Agreement.

As noted previously, section 3.3(d) of the Purchase Agreement provides that defendant Corning retains the following liabilities, in pertinent part:

> In connection with the operation of the Corning Electronics Business and the Assets, all liabilities for violations of environmental laws . . . applicable to such operation, which operations existed, or are based upon conditions that existed, prior to the Closing Date and to the extent such violations are not attributable to or otherwise adversely affected by . . . the Purchaser['s] actions.

(Purchase Agreement § 3.3 (DE 181 at 332-333)) (emphasis added).

For the reasons stated in the preceding section, plaintiff has demonstrated that there is no genuine issue of fact on the issue of whether it used or released TCE at the Property. Therefore, plaintiff is entitled to summary judgment on that part of defendant Corning's counterclaim that is premised upon violations "attributable to" plaintiff. (Id.). By contrast, because there is a genuine issue of material fact whether plaintiff exacerbated exiting conditions at the Property by, inter alia, demolishing the manufacturing building and concrete slab, plaintiff is not entitled to summary

judgment on that part of defendant Corning's counterclaim that is premised upon violations "adversely affected by" plaintiff's actions.  (Id.).

In so holding, the court rejects plaintiff's suggestion that defendant Corning must show that conditions underlying defendant Corning's breach of contract counterclaim both "did not exist prior to the closing date" and were "adversely affected by [plaintiff's] conduct."  (Pl's Mem. (DE 179) at 28).  Under § 3.3(d) of the Purchase Agreement, defendant Corning retains liabilities for environmental violations that "existed, or are based upon conditions that existed, prior to the Closing Date and to the extent such violations are not attributable to or otherwise adversely affected by [plaintiff's] actions."  (Purchase Agreement § 3.3 (DE 181 at 333)) (emphasis added).  In this manner, either the date of the existence of the conditions or the manner of plaintiff's actions can relieve defendant Corning of its retained liabilities.  To hold otherwise would lead to absurd results, whereby defendant Corning would retain liabilities even for conditions at the property solely attributable or otherwise adversely affected by plaintiff's actions.

The court also rejects plaintiff's suggestion that its actions with respect to demolition of the plant building and slab did not, as a matter of law, adversely affect conditions at the Property, because plaintiff "consulted with its nationally recognized consultant Arcadis" prior to demolition and slab removal. (Pl's Mem. (DE 179) at 28).  For reasons stated previously, regardless of whether plaintiff's actions were approved by plaintiff's consultant, there is a genuine issue of material fact whether they were approved by environmental regulators and whether they in fact adversely affected contamination at the Property.

In sum,  plaintiff is entitled to summary judgment on that part of defendant Corning's counterclaim that is premised upon violations "attributable to" plaintiff, but not on that part of

defendant Corning's counterclaim that is premised upon violations "adversely affected by" plaintiff's actions, under § 3.3(d) of the Purchase Agreement.

5.      Defendant Corning's Motion to Exclude Standard of Care Opinions

Defendant Corning moves to exclude any part of expert testimony of Hutto and Royer concerning whether defendant Corning has complied with "industry standards" for remediating contaminated property and standards of care governing the REC Program, on the basis that neither Hutto and Royer are qualified to give such expert testimony.

"The Fourth Circuit has ruled that when an expert's qualifications are challenged, 'the test for exclusion is a strict one, and the purported expert must have <u>neither</u> satisfactory knowledge, skill, experience, training <u>nor</u> education on the issue for which the opinion is proffered.'" <u>SMD Software, Inc. v. EMove, Inc.</u>, 945 F. Supp. 2d 628, 635 (E.D.N.C. 2013) (quoting <u>Kopf v. Skyrm</u>, 993 F.2d 374, 377 (4th Cir. 1993)) (emphasis added); <u>see</u> <u>Thomas J. Kline, Inc. v. Lorillard, Inc.</u>, 878 F.2d 791, 799 (4th Cir.1989); <u>see, e.g.,</u> <u>AVX Corp. v. United States</u>, 518 F. App'x 130, 135 (4th Cir. 2013)  (rejecting challenge to expert based upon lack of qualifications, holding expert "could reliably apply his general experience with groundwater contamination to the particular chemical contaminant TCE," under the court's "liberal construction of Rule 702's 'specialized knowledge' requirement").

Here, Hutto's qualifications include the following:

[He] is a Principal and Senior Project Manager at GEL Engineering, LLC with over 29 years of experience leading complex environmental and industrial projects including site characterization, permitting, and/or remediation. Typical projects include due diligence investigations, industrial site development, soil and groundwater assessment and remediation, dredge and waterfront permitting and management, and brownfield redevelopments. Typical sites include brownfields, planned industrial facilities, landfills, Resource Conservation and Recovery Act facilities, Comprehensive Environmental Response, Compensation, and Liability Act

facilities, waterfront terminals and marinas, petroleum bulk terminals, and manufacturing facilities. He routinely interacts with regulatory agencies in permitting and permit negotiations, as well as conducting stakeholder outreach.

(Hutto Jan. 2017 Rep. (DE 209 at 311)). His resume details eighteen "representative projects" in South Carolina on which he has acted as a project manager or in a lead technical role, including environmental site assessments, evaluations, monitoring, and remediation. (Id. (DE 209 at 311-315)). He holds undergraduate and masters degrees in geology, and he is a professional geologist and certified well driller in South Carolina. (Id.).

Dr. Royer has 24 years of experience "in consulting on complex hazardous waste site remediation projects." (Royer Jan. 2017 Rep. (DE 230-4 at 5)). He is currently employed for Arcadis, providing "technical consulting on . . . remedial alternatives," and he was previously employed as a senior environmental engineer for GE. (Royer Dep. 22, 26). He holds an undergraduate degree in environmental science, a masters degree in environmental pollution control, and a doctorate degree in environmental engineering. (Royer Jan. 2017 Rep. (DE 230-4 at 5)). His resume details his work experience as technical lead advisor in eight chlorinated solvent remediation sites, as well as eleven additional remediation sites. (Id. at 5-9). He has worked at three environmental contamination sites in North Carolina, including in interactions with the North Carolina Department of Environmental Quality regarding a site under the REC Program. (E.g., Royer Dep 25-26, 107).

Based on the foregoing, the court holds that Hutto and Royer are qualified generally to give testimony regarding industry standards of care for remediating contaminated property. Only Royer, however, is qualified to give testimony regarding whether defendant Corning's remediation falls below the standard of care set forth in the state rules governing the REC program. The court's

holding at this juncture is limited to evaluating the potential testimony of Hutto and Royer presented without context to specific issues or claims remaining for trial. The court notes that the expert reports of Hutto and Royer discuss these standards of care in varying respects, and it is not yet clear based upon the present record in what context Hutto and Royer will be sought to be introduced for testimony, given the scope of issues remaining for trial. In addition, the court reserves judgment on additional aspects of the relevance and reliability of the expert testimony, if offered for admission at trial.

In sum, the court grants in part defendant Corning's motion to exclude testimony of Hutto, to the extent of testimony concerning REC Program rules. The court denies in remaining part defendant Corning's motion to exclude testimony of Hutto and motion to exclude testimony of Royer. The denial of the motion to exclude is without prejudice, where other issues of relevance and reliability of the testimony may be raised and evaluated in the context in which the testimony is offered.

## CONCLUSION

Based on the foregoing, the court orders as follows:

1) Defendants' motion for summary judgment as to plaintiff's negligent misrepresentation and UDTPA claims (DE 200) is GRANTED, and that part of plaintiff's motion for summary judgment (DE 203) pertaining to these same claims is DENIED.

2) The secondary defendants' motion for summary judgment (DE 212) is GRANTED, and all claims remaining against the secondary defendants are DISMISSED as a matter of law.

3) Plaintiffs' motion for summary judgment as to defendants' counterclaims (DE 178) is GRANTED IN PART and DENIED IN PART as set forth herein. The court DENIES IN

PART plaintiff's motion for summary judgment as to defendant Corning's CERCLA counterclaims, breach of contract counterclaim, and related declaratory judgment counterclaims, except for that part of defendant Corning's CERCLA counterclaims bearing on the issue of whether plaintiff used or released TCE at the Property, and that part of defendant Corning's breach of contract claim premised upon violations attributable to plaintiff.

4) Plaintiffs' motion for summary judgment in that part pertaining to its CERCLA claims (DE 203) is GRANTED IN PART and DENIED IN PART. The court DENIES IN PART plaintiff's motion for summary judgment as to its CERCLA claims, except for that part bearing on the issue of whether plaintiff used or released TCE at the Property.

5) Plaintiff's motion to exclude and to strike expert evidence, and for sanctions (DE 215) is GRANTED IN PART and DENIED IN PART. The court EXCLUDES expert opinions of Mancini and Duncklee premised upon CSIA evidence and on the issue of whether plaintiff used or released TCE at the Property, as set forth herein. Remaining relief sought through the instant motion is DENIED.

6) Defendants' motion to exclude certain expert testimony of Philp (DE 221) is GRANTED on the basis set forth herein.

7) Defendants' motion to exclude and to strike expert testimony and reports of Hutto (DE 217) is GRANTED IN PART and DENIED IN PART as set forth herein.

8) Defendants' motion to exclude and to strike expert testimony and reports of Royer (DE 224) is DENIED.

9) Defendants' motions to strike declarations and portions of statement of facts and appendix (DE 241, 258) are DENIED AS MOOT.

10)  Plaintiff's motion to strike, to compel, and for sanctions (DE 246) is DENIED.

In sum, the following claims remain for adjudication at trial as between plaintiff and defendant Corning: 1) CERCLA claims and counterclaims (as limited on certain issues by summary judgment ruling herein); 2) declaratory judgment claims and counterclaims; and 3) breach of contract claims and counterclaims.  Accordingly, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial.  The parties are DIRECTED to confer and file within **21 days** from the date of this order a joint status report informing of 1) estimated trial length; 2) whether any claims or portions of claims must be decided by bench trial or a jury trial; 3) particular pretrial issues which may require court intervention in advance of trial, if any; and 4) at least three suggested alternative trial dates.  In addition where mediation is reported to have been completed in August 2017, and where the case has developed procedurally and substantively since that time, the parties shall specify if they wish to schedule additional period of time for additional mediation, court-hosted settlement conference, appointment of a special master, or other alternative dispute resolution, in advance of trial, and if so the date for completion of such.

SO ORDERED, this the 26th day of September, 2019.

_____
LOUISE W. FLANAGAN
United States District Judge

69

# Order Appendices

# Order Appendix 1



POLLUTION INCIDENT REPORTING FORM

Incident # _____
County _WK_

LOCATION OF INCIDENT    QUAD K39b

| Street Address, Road | | City/Town | County |
|---|---|---|---|
| 3900 Electronics Dr | | Raleigh | Wake |
| Date Incident Occurred | Time Incident Occurred | 7 1/2 Quad Name | Lat.: Deg: Min: Sec: |
| | | Raleigh East | 35 49 57 |
| | | | Long.: Deg: Min: Sec: 78 36 16 |

Draw Sketch of Area

AVX PLANT

SERVICE RD.

APPROX. SCALE
0  10  20  30

Concrete

Solvent Storage Shed

Excavation

TB-1

EXPLANATION
⊕ Test Boring Location and Number
⊠ Injection Well Location
↘ Surface Runoff

Intermittant Stream

ATTACH PHOTOCOPY OF MAP SHOWING:  1. Pollutant Source 2. Threatened Water Supplies
3. Direction of Overland Flow

DEQ00008820

# Order Appendix 2



304232

| LOCATION OF SOIL REMOVAL AREA | LAW ENVIRONMENTAL, INC. | | |
|---|---|---|---|
| **CORNING - AVX FACILITY, RALEIGH, N.C.** | SCALE AS SHOWN | Drawn: **BAR** Checked: **DCS** Date: **6-6-89** | Job No. **59-8503** Dwg. No. **2** |
| CONTOUR INTERVAL = 2 FT. | | | |

AVX009050

# Order Appendix 3



ComingDef-00024864

# Order Appendix 4

AVX005028



BASE MAP CORNING-AVX FACILITY. RALEIGH,NC

LAW ENVIRONMENTAL

JOB NO. 59-B503.01
DRAWN: JCP
CHECKED: RCL
DATE: 2-21-89
DRAWING 3

SCALE
AS SHOWN

LEGEND

○ SOIL BORINGS

⊕ MONITORING WELLS (AV-1) AND PIEZOMETERS (B-2)

—278— TOPOGRAPHIC CONTOURS

ASPHALT DRIVE

CHEMICAL STORAGE BLDG.

CONC. PAD

SOURCE

CULVERT

ACCESS ROAD

TANKS

SCALE IN FEET

0    20    40

N

# Order Appendix 5



N

Figure
2

CorningDel-00055708

TITLE: SITE AERIAL WITH PARCEL BOUNDARIES

SITE: PORTION OF CORNING GLASS WORKS
RALEIGH, NORTH CAROLINA
SITE ID: NCD003195161

wood.

Wood Environment &
Infrastructure Solutions, Inc.
5710 Oleander Drive, Suite 110
Wilmington, NC 28403
(910) 452-1185

DATE: 9-28-2018 | SCALE: AS SHOWN | PROJ.: 6560170002
DR: WBM | CHK: JAB
LOCATION: Project\AC\G\7462294\WGRAL2G\AR_SEC RFI 8 PowerMX\C Program Files\RFI_C.dwg4 xref 9302244

BRENTWOOD RD
BOOTHILL DR
MARSH CREEK

FORMER AVX BUILDING FOOTPRINT
RESIDENTIAL
CAROLYN DR
INGRAM DR

NEW HOPE CHURCH RD
LEMAY CT
CHEVIOT CT

COMMERCIAL/INDUSTRIAL

ATLANTIC AVE

ELECTRONICS DR

AVX PROPERTY
32.55 ACRES

FORMER DRY WELL
(APPROXIMATE)

FORMER CHEMICAL
STORAGE BUILDING

TREATMENT BUILDING

PORTION OF CORNING
GLASS WORKS SITE
BOUNDARY

ST FABIANS DR

TARHEEL DR

COMMERCIAL/INDUSTRIAL

400 feet
200

# Order Appendix 6



**Top-left table**

| Well | Date Collected | PCE | TCE | DCE | VC |
|---|---|---|---|---|---|
| Standard | | 0.7 | 3 | 70 | 0.03 |
| MW-1A | 11/10/2017 | 5.0 U | 320 | 37 | 5.0 U |
| MW-1B | 12/6/2017 | 1.0 U | 280 | 33 | 1.0 U |
| MW-2 | 9/16/2016 | 3.8 | 120 | 12 | 1.0 U |
| MW-3A | 11/8/2017 | 19 | 5.7 | 6.9 | 1.0 U |
| MW-3B | 12/6/2017 | 170 | 130 | 110 | 1.0 U |
| MW-3C | 4/4/2017 | 2.6 | 2,600 | 5.9 | 1.0 U |
| MW-3D | 4/5/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-4A | 4/4/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-4B | 11/15/2017 | 500 U | 17,000 | 500 U | 500 U |
| MW-5A | 11/9/2017 | 1.0 U | 80 | 4.1 | 1.0 U |
| MW-5B | 12/6/2017 | 1.0 U | 910 | 7.8 | 1.0 U |
| MW-5C | 9/18/2017 | 1.0 U | 37 | 5.4 | 1.0 U |
| MW-6A | 11/10/2017 | 1.0 U | 140 | 1.0 U | 1.0 U |
| MW-6B | 4/5/2017 | 1.0 U3 | 380 | 1.0 U3 | 1.0 U3 |
| MW-6C | 4/5/2017 | 1.0 U | 380 | 1.0 U | 1.0 U |
| MW-7B | 12/7/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-8A | 4/5/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-8B | 4/5/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-8C | 4/5/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-9B | 12/6/2017 | 1.0 U | 160 | 5.2 | 1.0 U |
| MW-10A | 11/9/2017 | 1.0 U | 3.9 | 1.0 U | 1.0 U |
| MW-10B | 12/6/2017 | 19 | 97 | 16 | 1.0 U |
| MW-11A | 4/5/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-12C | 4/4/2017 | 20 | 1.2 | 1.0 U | 1.0 U |
| MW-13A | 4/5/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-13B | 4/5/2017 | 1.0 U | 1.6 | 1.0 U | 1.0 U |
| MW-13C | 12/6/2017 | 1.0 U | 1.0 | 1.0 U | 1.0 U |

**Top-right table**

| Well | Date Collected | PCE | TCE | DCE | VC |
|---|---|---|---|---|---|
| Standard | | 0.7 | 3 | 70 | 0.03 |
| MW-14A | 4/5/2017 | 1.0 U | 2.3 | 1.0 U | 1.0 U |
| MW-14B | 11/13/2017 | 1.4 | 200 | 3.5 | 1.0 U |
| MW-14C | 4/5/2017 | 1.0 U | 43 | 1.0 U | 1.0 U |
| MW-14D | 12/26/2017 | 1.0 U | 69 | 1.3 | 1.0 U |
| MW-15A | 9/12/2016 | 1.0 U | 160 | 8.9 | 1.0 U |
| MW-16A | 4/5/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-16B | 12/13/2017 | 1.0 U | 1,100 | 1.0 U | 1.0 U |
| MW-16C | 12/13/2017 | 4.8 | 4,200 | 7.6 | 1.0 U |
| MW-17A | 4/4/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-17B | 11/8/2017 | 1.0 U | 2.1 | 1.0 U | 1.0 U |
| MW-18B | 4/4/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-19A | 12/6/2017 | 3.6 | 20 | 1.0 U | 1.0 U |
| MW-20A | 4/5/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-20B | 4/5/2017 | 1.0 U | 8.0 | 1.0 U | 1.0 U |
| MW-21B | 12/21/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-21C | 12/13/2017 | 10 U | 10 U | 10 U | 10 U |
| MW-22B | 12/21/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-22C | 12/7/2017 | 1.0 U | 5.0 U | 1.0 U | 1.0 U |
| MW-23B | 12/7/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-23C | 12/13/2017 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| MW-24A | 12/7/2017 | 1.0 U | 5.0 U | 1.0 U | 1.0 U |
| MW-25A | 11/10/2017 | 1.0 U | 70 | 1.1 | 1.0 U |
| MW-25C | 11/10/2017 | 2.0 | 1.0 U | 1.0 U | 1.0 U |
| MW-26 | 9/7/2017 | 6.2 J | 5,000 DJ | 18 | 1.0 U |
| MW-26A | 11/15/2017 | 50 U | 5,400 | 50 U | 50 U |
| MW-26C | 11/14/2017 | 1.0 U | 880 | 10 U | 1.0 U |
| MW-27A | 11/15/2017 | 50 U | 5,800 | 63 | 50 U |
| MW-27B | 11/10/2017 | 1.0 U | 120 | 1.0 U | 1.0 U |

**Bottom-left table**

| Well | Date Collected | PCE | TCE | DCE | VC |
|---|---|---|---|---|---|
| Standard | | 0.7 | 3 | 70 | 0.03 |
| MW-28A | 11/13/2017 | 20 U | 1,400 | 20 U | 20 U |
| MW-28C | 11/13/2017 | 10 U | 1,600 | 10 U | 10 U |
| MW-29A | 11/13/2017 | 25 U | 2,000 D | 19 J | 25 U |
| MW-29B | 11/14/2017 | 20 U | 5,000 D | 20 U | 20 U |
| MW-30A | 11/15/2017 | 50 U | 4,300 | 50 U | 50 U |
| MW-30B | 11/14/2017 | 200 U | 19,000 | 360 | 200 U |
| MW-31A | 11/14/2017 | 50 U | 4,300 | 50 U | 50 U |
| MW-31B | 11/15/2017 | 50 U | 6,200 | 50 U | 50 U |
| PSB-2 | 8/29/2017 | 180 U | 2,200 | 180 U | 180 U |
| PSB-3-16-20' | 8/29/2017 | 150 U | 1,800 | 150 U | 150 U |
| PSB-3-36-40' | 8/29/2017 | 180 U | 2,900 | 180 U | 180 U |
| PSB-4 | 8/30/2017 | 130 U | 1,200 D | 130 U | 130 U |
| PSB-5 | 8/30/2017 | 1.0 U | 310 | 10 U | 1.0 U |
| PSB-6 | 8/30/2017 | 25 U | 1,400 D | 25 U | 25 U |
| PSB-7 | 8/30/2017 | 25 U | 380 | 25 U | 25 U |
| PSB-8 | 8/31/2017 | 25 U | 220 | 25 U | 25 U |
| PSB-9 | 8/31/2017 | 25 U | 660 | 25 U | 25 U |
| PSB-10 | 8/31/2017 | 100 U | 1,700 J | 100 U | 100 U |
| PSB-12 | 8/31/2017 | 50 U | 3,000 | 50 U | 50 U |
| PSB-13 | 8/31/2017 | 5.0 U | 23 | 5.0 U | 5.0 U |
| PSB-14 | 9/1/2017 | 50 U | 680 | 50 U | 50 U |
| PSB-15 | 9/1/2017 | 5.0 U | 3,200 DJ | 84 J | 5.0 U |
| PSB-16 | 9/1/2017 | 25 U | 280 | 25 U | 25 U |

**Bottom-middle table**

| Well | Date Collected | PCE | TCE | DCE | VC |
|---|---|---|---|---|---|
| Standard | | 0.7 | 3 | 70 | 0.03 |
| OBS-1 | 9/16/2016 | 15 | 150 | 62 | 0.96 J |
| OBS-2 | 9/16/2016 | 7.9 | 100 | 35 | 0.65 J |
| RW-1 | 4/6/2017 | 11 | 78 | 23 | 1.0 U |
| RW-2 | 4/6/2017 | 100 U | 3,400 | 350 | 100 U |
| RW-3 | 4/6/2017 | 1.0 U | 1.2 | 1.0 U | 1.0 U |
| RW-4 | 4/6/2017 | 100 U | 7,400 | 100 U | 100 U |
| RW-5 | 4/6/2017 | 100 U | 4,900 | 100 U | 100 U |
| RW-6 | 4/6/2017 | 1.0 U | 460 | 10 U | 1.0 U |
| RW-7 | 4/4/2017 | 1.0 U | 11 | 2.0 | 1.0 U |
| RW-8 | 4/4/2017 | 50 U | 3,400 | 50 U | 50 U |
| RW-9 | 4/6/2017 | 1.0 U | 170 | 21 | 1.0 U |
| RW-10 | 4/6/2017 | 1.0 U | 5.1 | 1.0 U | 1.0 U |
| RW-11 | 4/6/2017 | 1.0 U | 33 | 27 | 1.0 U |
| RW-12 | 9/18/2017 | 1.0 U | 84 | 2.7 | 1.0 U |
| RW-12B | 11/9/2017 | 1.0 U | 63 | 2.4 | 1.0 U |
| SWB-1 | 3/6/2016 | 10 U | 72 | 8.3 | 0.54 J |
| SWB-2 | 5/19/2016 | 1.0 U | 10 | 12 | 1.0 U |
| SWB-3 | 5/19/2016 | 1.0 U | 7.0 | 110 | 4.4 |
| SWB-4 | 5/19/2016 | 50 U | 50 U | 50 U | 50 U |
| SWB-5 | 5/19/2016 | 0.96 J | 300 D | 20 | 1.0 U |
| SWB-6 | 5/19/2016 | 1.0 U | 2.4 | 1.0 U | 1.0 U |
| SWB-7 | 5/19/2016 | 1.5 | 9200 D | 15 | 1.0 U |
| SWB-8 | 5/19/2016 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |
| SWB-9 | 5/19/2016 | 1.0 U | 1.0 U | 1.0 U | 1.0 U |

PROJECTION: NAD 1983 StatePlane North Carolina FIPS 3200 Feet
AERIAL SOURCE: ESRI Online Imagery (NAIP, June 2014).

**LEGEND**

- ▬ ▬ ▬ Property Line
- ▭ Existing Building
- ▭ Former Building
- Perennial Stream
- Intermittent Stream

Trichloroethene (TCE) Concentrations
- ○ Not Analyzed
- ○ Not Detected or <1.0 µg/L (MDL)
- ● 1.0 to 3.0 µg/L
- ● 3.0 to 30 µg/L
- ● 30 to 100 µg/L
- ● 100 to 1,000 µg/L
- ● >1,000 µg/L

- ▭ Focused treatment area - RLC
- ▭ Focused treatment area - CC
- ▬ ▬ Biobarrier

**NOTES:**
1. Results were classified according to the NCAC 2L Groundwater Standards (2010).
   The NCAC 2L Standard for TCE is 3.0 µg/L.
2. Minimum Detection Limit (MDL).
3. All results are shown in micrograms per liter (µg/L).
4. **BOLD** - Constituent detected at concentration exceeding analytical method detection limit.
5. **BOLD** - Constituent detected at concentration exceeding the NCAC 2L Groundwater Standard.

J – The presented value for the constituent is considered estimated.
U – The constituent was analyzed for but not detected.

PCE - Tetrachloroethene
TCE - Trichloroethene
DCE - cis-1,2-Dichloroethene
VC - Vinyl Chloride

SCALE IN FEET: 0 — 150 — 300

AVX CORPORATION, CORNING/AVX FACILITY
RALEIGH, NORTH CAROLINA

**Proposed Remedy Layout w/ Compiled GW TCE Data (Arcadis 2016, AMEC 2017 & D&D 2017 Investigations)**

FIGURE **A-1**

ARCADIS — Design & Consultancy for natural and built assets

# Order Appendix 7

